THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
LOUIS STONE, True Name EUGENE MERRITT, Appel-
lant.

First Department, May 11, 1982

### APPEARANCES OF COUNSEL

*Debra Marcus* of counsel (*Andrew C. Fine* with her on
the brief; *William E. Hellerstein,* attorney), for appellant.

*Julie Copeland* of counsel (*Robert M. Pitler* with her on
the brief; *Robert M. Morgenthau, District Attorney,* attor-
ney), for respondent.

### OPINION OF THE COURT

LUPIANO, J.

On the afternoon of March 22, 1979, uniformed officers
Smith, Leonard and two others were on radio motor patrol.
The officers were members of the 28th Precinct task force,
whose purpose is to patrol narcotics-prone areas within the
precinct, known as "special condition areas", to disburse
crowds that formed to buy and sell drugs. At approxi-
mately 3:45 P.M., while patrolling such an area, the police

observed a crowd of about 15 people gathered near the corner of 116th Street and St. Nicholas Avenue. Pedestrians were forced onto the street in order to pass. The defendant was with another man who frequented that location. They were standing amongst the crowd. The police told everyone to leave the area. Some 25 minutes later the police returned. The defendant and his companion were still there, as were a number of other people. The police again told the crowd to disperse and warned that anyone remaining in the area would subsequently be required to produce identification showing that they lived in the vicinity. Approximately 45 minutes later the police again returned to this location and found the defendant and his companion still there amongst a group of people. Officers Smith and Leonard approached defendant and his companion and requested identification, admonishing them that failure to produce suitable identification would result in disorderly conduct summonses (Penal Law, § 240.20, subd 6). Defendant's companion produced identification from a back pocket of his trousers.

When Officer Smith made the same request of defendant, the latter started to reach into the left pocket of his jacket. As he moved his hand to do so, Smith observed a bulge in that pocket. Fearing what was in the pocket, the police officer placed both his hands on the outside of defendant's jacket, over the pocket and through the jacket's outer lining grasped the defendant's hand and the object contained therein. The feel of the object alerted the officer to the fact that the object was a gun. Smith shouted to his fellow officers that the defendant had a gun and directed defendant to remove his hand from the pocket slowly. The defendant complied, and the officer reached into the pocket and withdrew a loaded .22 semiautomatic pistol. The defendant was then placed under arrest and frisked for other weapons. A subsequent search at the police precinct disclosed that defendant possessed 17 glassine envelopes containing heroin.

The police conduct in this street encounter was reasonable and not overly intrusive. The sequence of events must be "viewed in its entirety as a dynamic encounter where compelling considerations are cast in competing roles

\* \* \* Our task then is to balance the defendant's right to be free from arbitrary searches and seizures with the enforcement duties of police officers. In considering whether the conduct of [the police] was justified, the standard to be utilized is reasonable suspicion and not absolute certainty \* \* \* 'The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' (*Terry v Ohio,* 392 US 1, 27.) \* \* \* Here, as in all stop-and-frisk cases, the standard to be applied is not probable cause, but rather reasonable suspicion. *Certainty* is not required (*People v Chestnut* [51 NY2d 14]; CPL 140.50, subd 3). To require more than 'reasonable suspicion' in a stop-and-frisk case is to require 'that a police officer [must] await the glint of steel before he can act to preserve his safety' (*People v Benjamin* [51 NY2d 267,] 271). The courts should reject such an absurd notion. The police officer is not an actor in a Hollywood scenario, where the quick draw of the gun provides exciting entertainment for the viewers. Rather, the police officer is experiencing the dangers of the real world where the Marquis of Queensberry rules do not apply" (*People v Rivera,* 78 AD2d 327, 329-331, app dsmd 54 NY2d 1021).

Confronted by the reality of the pervasiveness of drug dealing and the use of handguns, Officer Smith, a streetwise policeman, took a minimally intrusive course in light of the surrounding circumstances consonant with the protection of life and respect for human dignity (see *People v Samuels,* 68 AD2d 663, affd 50 NY2d 1035). Patently, Officer Smith's action, in that split second when he saw the bulge and defendant's reaching into the pocket containing such bulge, was reasonable. The limited pat-down was undertaken, not to discover evidence of a crime, but to enable the officer to pursue his investigation without fear of violence (see *People v Stroller,* 42 NY2d 1052, 1053; *Adams v Williams,* 407 US 143, 145-146). As aptly noted by the Court of Appeals in *People v Castro* (53 NY2d 1046, 1048): "The police had reasonable suspicion to warrant the stop which was reasonably related in scope and intensity to the circumstances surrounding the encounter. Based on

reasonable suspicion, the police were entitled to neutralize defendant for their own protection as well as that of by-standers (*People v Chestnut,* 51 NY2d 14)." Officer Smith testified that because in his previous encounters, defen-dants had reached into their hip pockets for wallets con-taining identification, he was afraid of what defendant was reaching for in his jacket pocket. The officer was justified in fearing that any further request for information (e.g., do you have a gun in your jacket pocket?) might well be answered by a bullet. Thus, the limited intrusion of seizing defendant's hand through the jacket served to maintain the *status quo* (see *People v Grant,* 83 AD2d 277, 279). It would be unrealistic to require Officer Smith to assume that the defendant's conduct was completely innocuous or innocent under all the circumstances. "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety" (*People v Benjamin,* 51 NY2d 267, 271, *supra*). Indeed, in *People v Benjamin* (*supra,* p 271) it was observed that an "officer * * * rightfully and dutifully on the scene * * * could not ignore possible indications of criminality, nor is there any logical reason for him to reject the natural mental connec-tion between newly encountered facts * * * More impor-tantly, there certainly is no justification for holding that an officer in such a situation cannot take note of a signifi-cant occurrence indicating a possible threat to his life".

Accordingly, the judgment, Supreme Court, New York County (HAFT, J.), rendered August 5, 1980, convicting defendant, upon his plea of guilty, of attempted criminal possession of a controlled substance in the fourth degree and attempted criminal possession of a weapon in the third degree, should be affirmed.

MILONAS, J. (dissenting). I would reverse the conviction. In my opinion, the physical evidence should have been suppressed.

This is an appeal from a judgment, entered August 5, 1980, in the Supreme Court, New York County (FITZER, J., at the pretrial hearing; HAFT, J., at plea and sentencing), convicting defendant, upon his plea of guilty, of attempted criminal possession of a controlled substance in the fourth degree and attempted criminal possession of a weapon in

the third degree, for which he was sentenced as a predicate felon to concurrent prison terms of from two to four years and from one and one-half to three years respectively. Defendant is currently incarcerated pursuant to these sentences.

Defendant's conviction arose out of an incident which occurred on the afternoon of March 22, 1979. Four New York City police officers, two of whom testified at the suppression hearing, were in uniform and on radio motor patrol with the 28th Precinct drug task force in an area designated as narcotics prone. At approximately 3:45 P.M., the officers approached the corner of 116th Street and St. Nicholas Avenue. A crowd of approximately 15 persons, including defendant, had gathered there. Defendant was purportedly in the company of another male who, according to the testimony of Officer Smith, one of the policemen, was someone who regularly frequented that location. In addition, the officers had previously dispersed similar crowds which had assembled on this particular corner.

Although there was no sign of any suspicious activity, such as the transfer of items between individuals, nor was any distinguishable conversation overheard, the people congregating on the street were commanded to move on. Officer Smith stated that this direction was specifically conveyed to the defendant and the person with him. The police then continued their patrol, returning some 20 minutes later. The defendant, his friend, and a number of others had remained on the scene. Officer Smith again told the crowd to leave and informed them that if they were still there when he got back, they should be able to produce some identification showing that they lived in the vicinity. However, when the officers made a third visit to the spot less than an hour later, the defendant and his companion were on the same corner. There were then about 10 or 11 persons on the sidewalk. Officer Smith admitted on cross-examination that while pedestrians had to walk around the group, no one was being pushed into the street.

The four officers exited their car and called defendant and the other man over to a fence, demanding identification. Defendant's friend reached into his back pants pocket and handed over a wallet containing identification with his

picture on it. When defendant attempted to put his hand into the pocket of his blue zipper jacket, Officer Smith claimed to observe a discernable lump, as he described it. Despite the fact that the defendant's motion constituted a normal manner of reaching into a pocket, and the "lump" had no outline and, according to the officer, could have been a wallet, Officer Smith immediately grabbed the defendant's hand and jacket. The object in question was solid to the touch, and Officer Smith shouted to a fellow officer that the defendant had a gun in his possession. The defendant was ordered to remove his hand from his pocket, which he did, and Officer Smith pulled out a loaded pistol.

After the defendant was placed under arrest, he was taken to the station house where a search ensued. Seventeen glassine envelopes containing a white powder, subsequently determined to be heroin, were discovered in a brown bag in his right-hand jacket pocket. At the conclusion of the pretrial hearing, the court denied the motion to suppress both the weapon and the drugs. On appeal, the defendant contends that the police officers lacked authority to stop him, and in the absence of reasonable suspicion that the bulge was a gun, to seize him.

In *People v Cantor* (36 NY2d 106, 111) the Court of Appeals held that whenever "an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment". Moreover, a person may not be stopped in a public place unless a police officer has reasonable suspicion to believe that such person is committing, has committed or is about to commit a crime. While the court recognized the common-law right of the police to make investigative inquiries, it noted (p 113) that "this authority does not give the police a license to violate the Constitution".

According to the court, a police officer should, after a valid stop, demand an explanation of the suspect's conduct. A search is warranted only if the officer reasonably suspects that he is in danger of physical harm. (*People v Sanchez*, 38 NY2d 72.) In that case, the court declared that suppression should have been granted, since the officer did

not testify that he considered himself to be in danger nor did he assert that the "hard object" which he encountered upon accidentally touching the defendant was or felt like a weapon. Similarly, in *People v Bernard* (41 NY2d 759), the court stated that where the defendant had done nothing wrong, and the officer's testimony did not contain any suggestion that he was apprehensive for his safety, the police officer had not acted reasonably when he reached into the defendant's pocket and removed a revolver. The defendant there had been standing nervously behind a pimp in a slouched position, his hands in his coat pockets which he proceeded to remove very slowly upon being requested to do so, and a heavy object not indicative of a revolver, slipped against the material of his pocket. See, also, *People v Williams* (79 AD2d 147, 151), wherein the court held that "a mere bulge or heavy object in a pocket does not impel a reasonable conclusion that the person is armed."

Distinguishable from this line of cases are those in which the officer involved saw a bulge which had "the configuration of a handgun" (*People v Goings,* 41 NY2d 759, 762), or the complete outline of a revolver (*People v Prochilo,* 41 NY2d 759), or a bulge at the waistband (a waistband bulge being deemed by the court to be a tell-tale sign of a weapon), coupled with the defendant's having conspicuously crossed to the opposite side of the street at the approach of the police, and it was after midnight in an area known for its high incidence of drug dealing (*People v De Bour,* 40 NY2d 210). Thus suppression is not appropriate where there is reasonable suspicion to conclude that the person being stopped is armed or, as in *People v Samuels* (50 NY2d 1035, cert den 449 US 984) and *People v Rivera* (78 AD2d 327) the totality of the circumstances are such as to provide support for the police intrusion.

None of the factors justifying the "seizure" of defendant are present in the instant case. "[I]nnocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand." (*People v De Bour, supra,* at p 216.) The defendant was not engaged in any suspicious conduct. He was merely standing on a street corner, along with a group of other people. While the area may have been

characterized as being one with a high incidence of drug-related activity, it was in the middle of the afternoon and the officers did not observe any passing of glassine envelopes between members of the group, or anything else of that nature. The fact that defendant appeared to be in the company of someone who had previously been seen to hang out on that particular corner is hardly a sufficient cause to single out the defendant from among all the other persons who likewise twice refused a police command to move on. Further, it is doubtful whether the police effort to disperse the crowd was, under the circumstances, warranted since the testimony at the hearing does not indicate that pedestrian traffic was even being blocked (people simply had to walk around the group). But assuming that the police behaved properly up to that point, and assuming also that they were justified in specifically selecting the defendant out from among the larger assemblage, an undefined lump or bulge in a pocket, which could have been a wallet, is, by itself, hardly an adequate basis for the police to have grabbed the defendant, who was doing nothing more than reaching toward his pocket in response to the police demand for identification.

In fact, Officer Smith acknowledged that the real motivation behind his action was "because I'm not used to a man going into a jacket pocket for a wallet. They always go to a hip pocket for a wallet." Thus, the police conduct at issue here rests on the highly dubious proposition that wallets are normally kept in rear pockets, rather than in jacket pockets, and, therefore, the officers could reasonably suspect that they were in physical danger. In view of the complete lack of any legal authority to support such a premise, it would be contrary to all statutory and constitutional requirements for this court to uphold a stop and frisk predicated on the notion that police officers may, in effect, reasonably conclude that they are in physical danger whenever they subjectively feel themselves to be in such peril.

Consequently, the police conduct in seizing and frisking the defendant was not proper, and the motion to suppress the physical evidence should have been granted.

KUPFERMAN, J. P., and BLOOM, J., concur with LUPIANO, J.; FEIN and MILONAS, JJ., dissent in an opinion by MILONAS, J.

Judgment, Supreme Court, New York County, rendered on August 5, 1980, affirmed.