THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v KENNETH CLEE, Defendant-Respondent.

First Department, October 21, 1982

**APPEARANCES OF COUNSEL**

*Julie Copeland* of counsel (*Robert M. Pitler* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Barry D. Leiwant* of counsel (*William E. Hellerstein,* attorney), for defendant-respondent.

**OPINION OF THE COURT**

SILVERMAN, J.

The People appeal from an order of the Supreme Court, Trial Term, made after a hearing, suppressing physical evidence (a pistol) and statements.

Two transit police officers going out on an undercover patrol were informed by their sergeant to be on the lookout for two males "one short, one tall armed with a gun," who had been committing armed robberies on the "lower part"

of the 72nd, 81st and 86th Street stations of the Eighth Avenue Subway in the Borough of Manhattan, City of New York. Dressed in casual clothes, the officers went to the 86th Street station, checked that out and boarded a southbound train and went to the 81st Street station. The northbound platform is on the upper level and the southbound platform is on the lower level. One of the officers went down to the southbound platform; it was about 12:40 A.M.; he observed an elderly man — in his late 60's — sitting on the south end of the platform; and another young man came down and stood in the middle of the platform. Thus at that hour of the morning there were two civilians and one police officer (not in uniform) on that platform. Two males came down the staircase, one of them being the defendant. The defendant is about 5 feet 9 inches tall and his companion about 5 feet 5 inches tall. They started to walk south in the general direction of the elderly man sitting on the bench. The police officer had a police radio in a shopping bag that he was carrying. The radio went on, giving a "time check." The two males stopped, looked back at the officer, turned around and started walking in the officer's direction toward the stairs. When they approached the officer, he said, "Just a minute fellows. Where are you going? I am a police officer." They said they were going to The Bronx. He said, "This is a southbound platform" (the wrong direction for The Bronx). He asked the two men where they lived and they said on Harrison Avenue, he asked where on Harrison Avenue and whether they had any identification. The defendant said he did not have any identification. At that point the officer observed a bulge in the defendant's left jacket pocket and could not tell what it was. The officer felt the pocket from the outside. It felt like a gun and the officer asked the defendant what he had there. The defendant said, "Oh, shit." At that point the officer removed the gun, disarmed it and put it in his pocket. By this time the officer's partner was also on the southbound platform. It was now 1:00 A.M. The officer gave the defendant a version of the *Miranda* warnings (held by the court below to be improper). The defendant was asked where he got the gun; he said he found it in a cab. The officer called for a police car, handcuffed the defendant,

and took him to the transit police headquarters where apparently other statements were made.

1. *Legality of the arrest and of the seizure of the gun.* If the stop and frisk were legal, then the arrest and the seizure of the gun were legal. We hold that the stop and frisk were legal.

"The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' *Terry* v. *Ohio,* 392 U.S. 1, 19 (1968)." (*Pennsylvania v Mimms,* 434 US 106, 108-109.) The "single issue" is "whether the action of the police officer was reasonable". (*People v Prochilo,* 41 NY2d 759, 761; see *People v Simmons,* 83 AD2d 79, 80; *People v Clements,* 88 AD2d 541.)

In our view, in all the circumstances, the officers acted reasonably. These circumstances include particularly the facts that there had been a series of robberies by two men, one tall and one short, at these particular subway stations; that both men or one of them, the tall one, were said to have been armed; that the officers were on undercover patrol looking for those robbers; that it was 1:00 A.M. on a lonely subway platform — one of the three where the series of robberies had taken place; that the defendant and his companion were walking toward a likely potential victim of a robbery, an elderly man sitting on a bench at the end of this lonely station (all highly suggestive to these experienced transit police officers of a classic potential subway station robbery situation); that the men turned and changed direction when the sound of a radio in a shopping bag was heard; that on being questioned they said they were going to The Bronx although they were on a platform for trains leading away from The Bronx. The officer saw some kind of a bulge in the defendant's pocket. At this point, any police officer would suspect that he was perhaps being confronted by an armed robber. In the circumstances, the touching of the outside of the defendant's pocket was a minimal intrusion, reasonable in the circumstances. (*People v Simmons,* 83 AD2d, at p 80; *People v Clements,* 88 AD2d 541, *supra; People v Rivera,* 78 AD2d 327, 330-331 ["the police had information

about past criminal conduct in this area in recent days and were alerted to imminent trouble * * * [P]rior to a frisk, Detective Sanchez engaged defendant in a conversation"].) The minimal intrusion of touching the outside of defendant's pocket was justified by the need "to allow the officer to pursue his investigation without fear of violence." (*People v McLaurin*, 43 NY2d 902, revg on dissenting opn below 56 AD2d 80, 84; *People v Stone*, 86 AD2d 347, 349, affd 57 NY2d 762; *People v Stroller*, 42 NY2d 1052, 1053.) An officer should be allowed to secure his own safety "without requiring him in haste and under pressure to make close calculations about danger to himself" (*Robbins v California*, 453 US 420, 431 [POWELL, J., concurring]).

It is true that the police officer did not say that he suspected danger of physical injury. Neither did he say he did not. Nobody asked the question. But what was the point of the police officer's touching the outside of the pocket with the bulge in it except to determine whether he was confronted by an armed man? Even before the police officer touched the outside of the defendant's jacket pocket, the officer at least had a common-law and statutory right to inquire, and reasonable suspicion that defendant was armed and was committing a crime — possession of a gun — or, about to commit one — robbery. (CPL 140.50 [Stop and Frisk].) After he received unsatisfactory answers to his questions, he touched the pocket and felt a gun, which he then took out of defendant's pocket. Once it was ascertained that the defendant had a gun in his pocket, the officer of course had the right to seize the gun and arrest the defendant.

Accordingly, we hold that the arrest and the seizure were legal.

2. *The statement in the subway.* The hearing Judge suppressed the statement made to the police officer in the subway — in part because it was the product of an illegal arrest, and in part because of insufficient *Miranda* warnings. For the reasons we have discussed, we find the arrest was legal.

Coming now to the claimed insufficiency of the *Miranda* warnings, the testimony as to those was: "I told the defendant, I said, 'you have the right to remain silent, anything

you say may be used against you,' and I asked the defendant, I said, 'Do you understand?' He said, 'Yeah.' I said, 'If you want an attorney, you can have one. If you can't afford one, one will be provided.' I said, 'You understand?' He said, 'Yeah.'"

■ It is argued that these warnings were insufficient because of a failure to state explicitly that the defendant could have an attorney actually present during the questioning. But warnings substantially the same as those here involved have recently been sustained against precisely this attack. (*People v Mandrachio,* 79 AD2d 278, 280, affd 55 NY2d 906; *United States v Cusumano,* 429 F2d 378, 380, cert den *sub nom. Riggio v United States,* 400 US 830.) As Judge LUMBARD remarked in the *Cusumano* case (p 380): "It is unrealistic to expect the same degree of formality with respect to waiver in questioning 'on the street' as in the stationhouse." We note also that here as in *Mandrachio,* the defendant, young as he was, had a previous arrest record, having been arrested twice before, and thus presumably had some familiarity with *Miranda* warnings.

Accordingly, the motion to suppress should have been denied insofar as the motion was addressed to the statement in the subway by the defendant to the police officer.

3. *Statements in the station house.* The hearing court also suppressed certain statements made in the station house. The record does not indicate precisely either the nature or the substance of these statements. The District Attorney said: "The conspiracy statements talks [*sic*] about their plans that evening and that evening he was in possession of the gun." (There were three cases pending against defendant: An indictment for possession of a weapon at the time of arrest; an indictment for robbery in the first degree relating to an incident two days before the arrest; and a conspiracy charge, apparently by way of a felony complaint in the Criminal Court.) The station house statements were not explored at the hearing. The hearing court held: "There is no way based on this testimony that my decision is going to be altered in any manner, no matter what I hear from now on * * * [T]here is absolutely no way anything is going to go in this case, so I can dictate my decisions on these things now or we can go through the other officer

who I presume is going to testify to further statements. All of these further statements would be barred as tainted based on the initial improper stop, the initial improper arrest, the initial improper Miranda warnings."

The hearing court thus held: "[T]hat since there was an improper stop and arrest, anything thereafter would be tainted, and therefore, any statements made thereafter at the police station by the defendant would necessarily have to be suppressed."

Thus no evidence was adduced of what happened in the police station.

As we have held that the stop and arrest were legal and the *Miranda* warnings sufficient, fairness requires that the parties have an opportunity at a reopened *Huntley* hearing to explore whether the statements allegedly made in the police station should be suppressed.

The order of the Supreme Court, New York County (S. LEVY, J.), rendered November 26, 1980 granting defendant's motion to suppress physical evidence and statements, should be reversed, on the law and the facts; the motion to suppress denied as to the pistol and ammunition and as to the statements by the defendant to the police officers in the subway station; and the matter remanded to Trial Term to reopen and continue the suppression hearing with respect to statements made in the police station.

KUPFERMAN, J. P., ROSS and ASCH, JJ., concur.

Order, Supreme Court, New York County, entered on November 26, 1980, unanimously reversed, on the law, and the facts; the motion to suppress denied as to the pistol and ammunition and as to the statements by the defendant to the police officers in the subway station; and the matter remanded to Trial Term to reopen and continue the suppression hearing with respect to statements made in the police station.