THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ANTO-
NIO GONZALEZ, Respondent.

First Department, March 4, 1986

## APPEARANCES OF COUNSEL

*Steven M. Jaeger* for respondent.

*Peter D. Coddington* of counsel (*Stuart L. Sanders* with him on the brief; *Mario Merola, District Attorney,* attorney), for appellant.

## OPINION OF THE COURT

KASSAL, J.

The primary issues before us are: (1) defendant's standing; (2) was there probable cause to search the brown

paper bag situated between defendant, seated in the front passenger seat of the vehicle, and Brenda Martinez, who was seated in the driver's seat; and (3) have the People established that there was a voluntary consent to the warrantless search. In our view, defendant does have requisite standing and, at the time, there was no basis rising to the level of reasonable suspicion to search the bag and defendant's person. The record also supports the finding by the suppression court that there was no voluntary consent to the search.

On January 20, 1984, at about 12:05 A.M., Officers Biller and O'Connor were on patrol in a marked police car, when they observed a white, two-door Pontiac LeMans stopped or standing adjacent to a fire hydrant, at the intersection of Watson and Ward Avenues, in The Bronx. Officer Biller, who had been operating the patrol car, stopped and requested Ms. Martinez to move the auto from the hydrant, whereupon she stated that she did not have a license and that it was not her car. The officer maneuvered the patrol car so that its headlights faced the front of the Pontiac and both officers exited their vehicle carrying flashlights, with Biller proceeding to the passenger side and O'Connor to the driver's door.

O'Connor asked Ms. Martinez to produce her operator's license, registration and insurance certificate. She responded that she did not have a license but the registration was produced from the glove compartment, although the record does not reflect whether it was retrieved by defendant or by Martinez. In any event, after Ms. Martinez was unable to state the name of the owner in response to the officer's inquiry, O'Connor, who was shining a flashlight into the car, noticed a closed, brown paper bag, resting against the seat, between defendant and Martinez. He inquired as to the contents of the bag, whereupon Martinez picked up the bag, handed it out the window and stated: "It's only boxes of envelopes." According to O'Connor, "she became confused at that point, and didn't understand me. I said: The bag right there", whereupon she complied with the command and handed the bag out the window. Biller, who was positioned on the sidewalk behind the passenger door, only heard "highlights" of what had transpired between Officer O'Connor and Ms. Martinez. But, in response to a question on cross-examination as to at what point Officer O'Connor "ask[ed] her to give him the bag", Biller responded, "That was after the papers, sir."

O'Connor took the bag and placed it on the roof of the car.

He then shook it and heard a metallic sound. Contrary to the fact-finding analysis by the dissent, O'Connor did not testify that he believed the bag to contain "a hidden weapon" or an object heavy enough to be a weapon. Without any further inquiry, he opened the bag to examine the contents and discovered two tan stationery-type boxes. When he opened the first, he found hundreds of glassine envelopes and yelled to Biller, "watch out, I've got something here." Although Biller did not examine the contents, he saw that it contained what appeared to be glassine envelopes and believed that they had powder in them. Actually, the envelopes had no powder and were empty. In any event, according to Biller, he heard Officer O'Connor say, "Look out, Rich. They're going." This, according to Biller, meant that the occupants were to be arrested for possession of drugs.

After examining the bag's contents, O'Connor directed Ms. Martinez to exit the car while Biller proceeded to search defendant. As far as Biller was concerned, at that moment, both had been arrested and he was going to make sure that they did not have any weapons. He directed defendant to place his hands on the dashboard and, noticing that defendant had only one hand, patted him down. In defendant's left jacket pocket he found what appeared to be a tinfoil, which he felt through the material. It was soft, about an inch and a quarter wide and a half inch thick. Examination of the foil disclosed that it contained two other tinfoils, containing a white powder, later discovered to be cocaine. The two occupants were handcuffed and taken to the precinct for a further check to ascertain whether the vehicle had been stolen. During the ride to the station house, defendant told O'Connor that if anything was wrong, he would take the "heat" for the car: "If the car's stolen, it's my fault. I borrowed it * * * Anything that you have got here tonight, is mine * * * The stuff that was on me was a wedding present; we're getting married, and I got it as a present." A subsequent search of Ms. Martinez at the precinct revealed her to be in possession of marihuana but the record is unclear as to whether any formal charges were filed against her or whether she was prosecuted for possession of a controlled substance. However, she was issued summonses for being an unlicensed operator (Vehicle and Traffic Law § 509 [1]) and for parking next to a fire hydrant (Traffic Regulations of City of NY § 81 [b]).

Defendant, charged with criminal possession of a controlled substance in the fourth degree, moved to suppress the physical

evidence seized at the time of his arrest. Following a hearing, the suppression court granted the motion, concluding that the seizure of the paper bag, on the front seat of the car, amounted to a warrantless, nonconsensual search, in violation of defendant's 4th Amendment rights. In so finding, the court cited the conflict in the proof as to whether the officers had requested or demanded that the bag be handed over to them and held that the People had not satisfied their burden of showing that the search was voluntarily consented to. Observing that the occupants were young and without experience in dealing with the police, it was concluded that they may have felt that they were not at liberty to challenge the authority of the officers, who had approached the vehicle on both sides, shining flashlights into the car. The court also found that no probable cause existed to search the paper bag. It held that, although the inability of the female occupant to produce a driver's license and her unfamiliarity with the name of the owner of the vehicle may have permitted further inquiry, the officers did not have the right to seize and search the occupants at that time.

### STANDING

■ While the suppression court did not address or resolve defendant's standing in its written decision, albeit the issue was raised at the combined *Mapp-Huntley* hearing, we find the record sufficient to conclude that defendant does have requisite standing to contest the search. In concluding otherwise, the dissent overlooks that the criminal charges related to the search of defendant's person. Clearly, he has standing to move to suppress property taken from his person *(see, People v Barshai,* 100 AD2d 253, 256). There were no charges associated with the search of the bag, it being undisputed that the bag contained empty glassine envelopes. The People argue, and the dissent agrees, that the search of the defendant's person resulted from what was found inside the bag and that Gonzalez, as a passenger, lacked standing with respect to the search of the bag. We disagree.

In order to have requisite standing to challenge the validity of a warrantless search, a defendant must establish that he had a reasonable expectation of privacy in the area of the search. *(Terry v Ohio,* 392 US 1, 9; *Rakas v Illinois,* 439 US 128, 140; *United States v Salvucci,* 448 US 83, 95; *People v Ponder,* 54 NY2d 160, 166.) The ultimate burden is on the

defendant but the operative facts relevant on the issue may be gleaned from the record as a whole, including the account of the events offered by the police officer *(see, People v Sutton,* 91 AD2d 522).

As applied here, the *only* proof relating to standing was furnished by Officer O'Connor that defendant told him that he had borrowed the vehicle from a friend who was now in Puerto Rico. There is nothing in the record to dispute that. Although it is not disclosed precisely when the statement was made, the dissent adopts the People's contention and concludes that the information was imparted to the officer when the occupants were being taken to the precinct and, at the time, defendant was attempting to "protect" Martinez and persuade the officers to release her. In our view, this is unnecessarily speculative in that the only proof on the issue is that defendant stated that he had borrowed the car from a friend, which is sufficient to find that he had a legitimate expectation of privacy so as to confer requisite standing with respect to the bag.

It is irrelevant whether the statement was made at the scene or later, on the way to the precinct. The issue of standing in terms of the right of a defendant to contest the propriety of a search only arises when a motion to suppress is made, not at the time of the initial police encounter. Only where the People challenge a defendant's standing is it necessary to establish that there was a legitimate and reasonable expectation of privacy in the area of the search.

The critical consideration is not when the defendant related to the officers that he had a sufficient privacy interest, but rather, whether he did, in fact, have a legitimate expectation of privacy. There is nothing in the record to refute the fact, as testified to by the officer, that defendant had stated that he had borrowed the car from a friend. In the absence of contradictory proof, there is no basis to conclude otherwise, particularly taking into account that the vehicle was not in fact stolen and no charges were brought for possession of a stolen vehicle. Nor may we speculate that the car may have been borrowed by Martinez. She disclosed to the officers that she was unlicensed and they never inquired of defendant whether he was the owner or was otherwise entitled to possession.

Unlike the situation in *Rakas v Illinois (supra),* involving the search of the interior of a vehicle in which the defendant was a passenger, in our case, Gonzalez, having borrowed the

vehicle, did as a result have sufficient dominion and control over it. Bearing in mind that 4th Amendment rights are personal in nature, we conclude that, in moving to suppress, defendant was "asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties". *(Rakas v Illinois, supra,* at p 139.)

CONSENT

■ We also agree with the suppression court that the People did not sustain their burden of establishing that there was a voluntary consent to the search of the bag. Concededly, the burden of proof is a heavy one and the prosecution must establish the voluntariness of a defendant's consent and that it was not the result of duress or coercion, express or implied. *(Bumper v North Carolina,* 391 US 543, 548-550; *People v Whitehurst,* 25 NY2d 389, 391; *People v Gonzalez,* 39 NY2d 122, 127-128; *People v Springer,* 92 AD2d 209, 212-213.)

*People v Gonzalez (supra)* is instructive. In that case, Chief Judge Breitel observed (at p 128):

"Consent to search is voluntary when it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle (see *People v Kuhn,* 33 NY2d 203, 208, *supra; Schneckloth v Bustamonte,* 412 US 218, 225-228, *supra).* As the Supreme Court stated in *Bumper v North Carolina* (391 US 543, 550, *supra),* 'Where there is coercion there cannot be consent'.

"No one circumstance is determinative of the voluntariness of consent. Whether consent has been voluntarily given or is only a yielding to overbearing official pressure must be determined from the circumstances".

In *Bumper v North Carolina (supra,* at pp 548-549), the Supreme Court observed in relation to the burden imposed upon the prosecution: "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. *This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority"* (emphasis added).

In *People v Gonzalez (supra,* at pp 128-130), the Court of Appeals discussed the various factors to be considered in deciding whether the consent to a search was freely and voluntarily given, namely: (1) whether, at the time of the

search, the individual was in police custody and the circumstances surrounding the custody or arrest, including the number of officers present at the time and the extent to which the individual was restrained; (2) the personal background of the defendant, including his age and prior experience with law enforcement officers; (3) whether the individual was evasive or uncooperative with law enforcement authorities; and (4) whether the defendant was advised by the police of his right to refuse to consent.

In our case, the People contend that the search was consented to in that Ms. Martinez freely handed the paper bag to the officer after an inquiry as to its contents and without any coercion on his part. However, taking into account the nature of the burden imposed upon the People, the relinquishment of the bag here amounted to an "acquiescence" to the authority of the officers, positioned on both sides and shining flashlights into the car. Both occupants were young and inexperienced in law enforcement matters. Under the circumstances, the nature of the encounter was sufficiently intimidating to convey the impression that both occupants were neither free to leave nor to refuse the officer's command with respect to the paper bag. Although the People argue that the bag was surrendered without any demand to turn it over, the record does not support the claim that Martinez did so voluntarily. According to O'Connor, after his initial inquiry, Martinez became confused and the police officer repeated "The bag right there". Considering all of the circumstances, the quoted words amounted to an official demand that the bag be tendered to the officer. (Cf. People v Whitehurst, supra.)

While there was testimony that the officer feared for his own safety and that of his partner, the record does not support the claim that he was apprehensive. There was nothing to give rise to any suspicion of wrongdoing by the occupants—no furtive movements nor any attempt to conceal anything. Thus, there was a basis for the suppression court to conclude, in passing upon credibility, that the testimony was " 'patently tailored to nullify constitutional objections.' " (People v Parmiter, 55 AD2d 938, quoting People v Garafolo, 44 AD2d 86, 88; People v Smith, 77 AD2d 544; see also, People v Quinones, 61 AD2d 765.) The same holds true with respect to the statement by O'Connor that he was surprised and "jumped back" when Martinez handed the bag out the window, especially considering our finding that the request with

respect to the bag could be reasonably interpreted as a demand, requiring compliance.

Under all the circumstances, and applying the various factors enumerated in *People v Gonzalez (supra)*, we agree that the People did not satisfy their burden on the issue. The surrender of the bag here was a "capitulation to authority" *(People v Gonzalez, supra,* at p 129), or "no more than acquiescence to a claim of lawful authority" *(Bumper v North Carolina, supra,* at p 549). To the extent that the occupants of the vehicle did cooperate, it has not been shown that they did so freely and voluntarily and that the action amounted to "an unequivocal product of an essentially free and unconstrained choice" *(People v Gonzalez, supra,* at p 128).

### PROBABLE CAUSE

■ Equally without merit is the People's argument that there was probable cause for the search. As observed in *Terry v Ohio (supra,* at pp 21-22), the applicable standard requires that "the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? Cf. *Carroll* v. *United States,* 267 U.S. 132 (1925); *Beck* v. *Ohio,* 379 U.S. 89, 96-97 (1964)." In order to justify a stop, there must be an articulable basis, either initially or during the encounter, to establish reasonable suspicion that the individual was involved in the commission of a crime. As observed in *People v De Bour* (40 NY2d 210, 215), there must be "a founded suspicion predicated on specific articulable facts that criminal activity is afoot." In passing upon the propriety of a stop, it is necessary to consider all of the surrounding facts with respect to the central inquiry under the 4th Amendment—"the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *(Terry v Ohio, supra,* at p 19; *see also, Pennsylvania v Mimms,* 434 US 106, 108-109.)

In *People v De Bour,* the Court of Appeals considered the various levels of permissible police intrusion which must be "reasonably related in scope to the circumstances which rendered its initiation permissible" (40 NY2d, at p 215). The *first level* of justifiable police intrusion authorizes an officer to approach to request information where there is "some objective credible reason * * * [although] not necessarily indicative

of criminality" *(supra,* p 223). The *second level,* the common-law right to inquire, "is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure" *(supra,* p 223). The *third level* permits the police officer to forcibly stop and detain for questioning where there is reasonable suspicion that a person has committed, is committing, or is about to commit, a felony or misdemeanor and includes the statutory right to frisk if the officer reasonably suspects himself to be in danger of physical injury by virtue of the detainee being armed (CPL 140.50 [3]). The *fourth and final step* permits a police officer to arrest and take the person into custody when there is probable cause to believe that he has committed a crime or offense in the officer's presence (CPL 140.10).

As applied here, the officers were justified in approaching to request information since the vehicle was stopped or standing at a fire hydrant, concededly a traffic infraction. The responses furnished by Ms. Martinez, that she did not have a license and did not know who the owner was, clearly served to heighten the suspicions of the officer. While the circumstances justified the initial stop and the inquiry, there was nothing to render permissible any greater level of intrusion *(see, People v McNatt,* 65 NY2d 1046, 1048; *see also, People v Howard,* 50 NY2d 583, 590, *cert denied* 449 US 1023). There were no furtive movements indicating that either occupant was secreting anything; the officers noticed no bulges in their clothing; nor was there anything to suggest that there were weapons inside the car. To the extent that O'Connor was at all apprehensive, this was alleviated when he took possession of the bag. As noted, the suppression court did not credit the officer's "tailored" testimony that he feared for his safety. In any event, we find that he acted prematurely and without justification in examining the contents of the bag without conducting any further inquiry of the occupants.

In *People v Vidal* (71 AD2d 962), a plain-clothes detective observed a vehicle stopped at a bus stop in Jamaica, Queens. Defendant was sitting in the driver's seat and there were two other males seated in the rear. Complying with the request by the officer, defendant exited the car and produced a registration, which revealed that the owner was a female, but he could not produce a driver's license. The officer's partner opened the door on the driver's side and, leaning into the car,

allegedly to question the passengers, observed a plastic envelope containing marihuana on the front seat. Lifting the armrest, he found two bags of white powder which was later determined to be cocaine. The Appellate Division, Second Department, finding an articulable basis to approach the vehicle to inquire, nevertheless, held that the opening of the door amounted to a search and was not supported by probable cause since there was no basis to conclude that the officer reasonably believed that he was in physical danger.

Similarly, in our case, and consistent with the holding of the Court of Appeals in *People v McNatt (supra)* while the facts disclosed in the record support the existence of a right to inquire, there was no probable cause to search the bag. Mere hunch or suspicion on the part of the officer is insufficient for that purpose *(see, People v Battaglia,* 56 NY2d 558, *revg* on dissenting opn of Hancock, Jr., J., 82 AD2d 389, 395; *see also, People v Davis,* 36 NY2d 280; *People v Russell,* 34 NY2d 261). While it is argued that the search may be sustained on the basis of the fact that the encounter took place in a high crime, "drug-infested neighborhood," a similar claim could be advanced as to countless other communities in our city where there are diverse criminal elements and activities. The existence of crime on our streets, however, does not alone furnish a basis to disregard fundamental constitutional rights and liberties.

However, even if we were to assume that the officer was justified in examining the contents of the bag, it is conceded that it contained empty glassine envelopes, the possession of which is susceptible to a variety of innocent interpretations and is not necessarily indicative of criminal activity. Officer Biller admitted on cross-examination that such envelopes could be used for several lawful purposes, namely, stamp and coin collecting. Where, as here, behavior is equivocal and susceptible to an innocent explanation, it may not furnish probable cause for a warrantless search.

Aside from the foregoing, it is undisputed that the frisk did not disclose any weapon. Officer Biller felt what he referred to as something "soft * * * about an inch, an inch and a quarter wide; and maybe * * * a half inch thick." When this pat down revealed defendant to be unarmed, there was no justification for the officer to proceed to a further invasion of defendant's rights by a searching examination of the inside of his jacket pocket *(cf. People v Battaglia, supra).* Surely, what Officer Biller "squeezed" through the material of defendant's jacket

was not and could not be considered by him to be a weapon. In our view, there were no exigent circumstances here to justify the level of intrusive conduct by the officers.

Accordingly, the order, Supreme Court, Bronx County (Jerome Hornblass, J.), entered June 4, 1984, which granted defendant's motion to suppress, should be affirmed.

SULLIVAN, J. (dissenting). I would reverse the order granting suppression of physical evidence and defendant's statements to the police, and remand the matter for trial. In a two-count indictment defendant had been charged with the crimes of criminal possession of a controlled substance in the fourth degree and criminally using drug paraphernalia in the second degree. The following account is from the testimony of the arresting officers, who were the only witnesses at the suppression hearing.

At approximately 12:10 A.M. on January 20, 1984, defendant was a passenger in a white LeMans which was illegally parked next to a fire hydrant in a high crime area. Uniformed Police Officers Biller and O'Connor, on routine patrol in a marked police vehicle, pulled alongside and asked Brenda Martinez, who was sitting in the driver's seat, to pull the car in towards the curb and to produce her operator's license as well as the registration and insurance card for the car. Ms. Martinez replied that she did not have a license, and that the car was not hers.

Officer Biller left the police car and positioned himself just behind the front passenger's seat of the car, where defendant was sitting. Officer O'Connor, an 18-year veteran of the police department, walked to the driver's side and again asked Ms. Martinez for her license, registration and insurance identification card. Both officers shined flashlights into the car.

Ms. Martinez handed Officer O'Connor a registration card but could not produce a driver's license or insurance card, and was unable to name the car's owner. Officer O'Connor then decided to place defendant and Ms. Martinez under "technical arrest" for possession of a stolen car until the question of ownership could be resolved. Before he could do so, however, his flashlight illuminated a partially opened, brown paper bag on the drive shaft hump between the front seats. When Officer O'Connor asked Ms. Martinez about its contents, she responded by reaching for the bag. Officer O'Connor, fearful that it might contain a gun, jumped away from the car.

Assured by Ms. Martinez that the bag contained "only boxes

of envelopes", Officer O'Connor finally took it and, shaking it, heard a metallic sound. When he opened the bag, he discovered two rectangular cardboard boxes, one of which was crammed with hundreds of white glassine envelopes arranged in packs, staggered so that the tops of alternate packs touched opposite sides of the box while their bottoms overlapped in the middle. Since the confluence of the packs in the middle of the box appeared lighter in color, Officer O'Connor, based on prior experience, thought that he had found a large amount of drugs packaged in "decks", and immediately displayed the inside of the box to Officer Biller, telling him, "Be careful Richie, they're going."

As a member of a narcotics team, Officer Biller had made hundreds of drug-related arrests. From prior experience he also thought that the glassine envelopes contained drugs, and believed that persons carrying such a large amount of narcotics frequently were armed. Concluding that Officer O'Connor's warning meant that the occupants of the car were under arrest, he ordered defendant to place his hands on the dashboard, and then reached into the car to frisk him. In defendant's left jacket pocket, Officer Biller felt something soft, approximately 3 to 4 inches long, 1 to 1¼ inches wide, and one-half inch thick, which he thought to be tinfoil. Believing that he had found more contraband, he reached into the pocket and removed a large piece of tinfoil containing two smaller tinfoil packets, each of which held a quantity of white powder.

After Ms. Martinez and defendant had been handcuffed and backup units summoned, Officer Biller gave his partner the powder-filled tinfoil packets which he had removed from defendant's pocket, and Officer O'Connor reexamined the brown paper bag. He found only a stamp pad and a rubber stamper bearing the legend "Hunter" in the second box. He also fanned the glassine envelopes in the other box, but found, contrary to his original belief, that they did not contain any white powder.

Defendant and Ms. Martinez were taken to the station house where it was determined that the LeMans was not the subject of a stolen vehicle alarm and that, while none of the glassine envelopes in the cardboard box contained contraband, each of them was stamped "Hunter". A small amount of marihuana, which she was charged with possessing, was found in Ms. Martinez' pocketbook. She was also issued two sum-

monses, one for parking near the hydrant, the other for being an unlicensed operator.

As Officer O'Connor began to prepare the various arrest reports, he informed both Ms. Martinez and defendant that he would forego advising them of their constitutional rights since he was only interested in pedigree information. He also told Ms. Martinez that she would be rearrested if the car turned out to be stolen after its serial number was checked at the pound. At that point, defendant stated that he would "take the weight" if the car was stolen, since he had borrowed it from someone who had gone to Puerto Rico. He also added that the other items seized had been given to him as a gift in contemplation of his impending wedding to Ms. Martinez. Officer O'Connor told defendant not to speak any further and then read him the *Miranda* warnings. After being advised of his rights, defendant acknowledged that he understood each of them, and agreed to speak to Officer O'Connor. He repeated his earlier admissions and asked that Ms. Martinez be released. Later, en route to Central Booking, Ms. Martinez asked the officers not to call her family because her father and brother were both policemen and disliked defendant. Once again defendant insisted that he would "take the weight" for the car.

In suppressing the physical evidence and defendant's statements the court concluded that the search and seizure of the brown paper bag were not supported by exigent circumstances, probable cause or consent, thus vitiating all that followed. It found that the circumstances did not give rise even to a suspicion of wrongdoing by the car's occupants. Moreover, it found that the officers did not have any articulable reason to fear for their safety, and also rejected their claim that Ms. Martinez gave the bag voluntarily to Officer O'Connor. Noting a conflict in the testimony, the court held that, even if the bag had been requested and not demanded, the car's occupants "probably felt they were not at liberty to refuse the request of the police." The court refused to address the standing issue, which the People had raised, apparently because it found the search illegal.

Since the suppression court's determination turns on its finding that the seizure and inspection of the brown paper bag were illegal the threshold issue is, as the People argued, defendant's standing to challenge the propriety of that intrusion. If defendant lacks standing, the legality of the seizure and inspection of the bag becomes academic, since "[a] person

who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *(Rakas v Illinois,* 439 US 128, 134, citing *Alderman v United States,* 394 US 165, 174.)

Standing, in the factual context here presented, depends on a showing that defendant had a property or possessory interest in the car or in any property seized therefrom. *(People v Ponder,* 54 NY2d 160, 163, 166.) A passenger in an automobile who has asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized therefrom, and who has failed to show that he had any legitimate expectation of privacy in the vehicle lacks standing to challenge a search of its interior or the seizure of the property. *(Rakas v Illinois,* 439 US, at p 148; *People v David L.,* 56 NY2d 698, *revg* 81 AD2d 893 *on dissenting memorandum at* 895-896; *People v Ward,* 95 AD2d 233; *People v Traynham,* 85 AD2d 748, 749.)

Since the abolition of the "automatic standing" doctrine in crimes where the accused is charged with possession of the property sought to be suppressed *(see, United States v Salvucci,* 448 US 83; *People v Ponder,* 54 NY2d 160, *supra),* the burden of establishing that his own 4th Amendment rights have been violated *(United States v Salvucci, supra,* at p 95; *People v Ponder, supra,* at p 165) lies with the defendant seeking to suppress evidence. Thus, absent proof of a property or possessory interest in the car, or interest in the brown paper bag, or that defendant had a reasonable expectation of privacy in the car, his rights have not been violated.

In this regard, defendant has completely failed to meet his burden. He has never argued that he had a privacy interest in the bag itself. He has admitted that he does not own the car, but offers, as proof of an obscure inchoate right of privacy in the contents of any parcel found in the car, his statements to the police, made after the search of the brown paper bag and his person and, indeed, after his arrest, that he would "take the weight" because he had borrowed the car from some unidentified friend who had gone to Puerto Rico.[1] But this

---

1. As already noted, when the officers first approached the LeMans, Officer Biller stood on the passenger side next to where defendant was sitting and would have heard anything that defendant said at that time. He testified that defendant made a statement at two intervals: "One was made

assertion, clearly made solely to protect Ms. Martinez, does not satisfy defendant's burden on the standing issue. Indeed, when defendant first had the opportunity to explain his possession of the car, after the officers initially approached and questioned Ms. Martinez, he remained silent. Had the car been entrusted to him, as he claimed later, the natural reaction would have been to explain at that time why it was in his possession, particularly when it was clear that Ms. Martinez could not satisfactorily document any possessory interest to the police. Nor is there anything in the record to suggest that the unidentified friend was the person named in the registration card, whom Ms. Martinez did not know. Finally, defendant's motion papers merely describe him as "a passenger in a car" and allege only that he looked in the vehicle's glove compartment for the registration and insurance card.

Thus, the only police conduct which defendant has standing to challenge is the initial approach and inquiry, but, clearly, the original encounter was free of taint. "[A] police officer, in the absence of any concrete indication of criminality, may approach a private citizen on the street for the purpose of requesting information." *(People v De Bour,* 40 NY2d 210,

---

in the car going to Central Booking while I was talking to him", the essence of which was that he would take the weight after he realized that Ms. Martinez, as the person sitting behind the wheel, would be charged with the crime if the car turned out to be stolen. Questioned about the second statement, Officer Biller replied, "He said something to the fact at the stationhouse that, in the Processing Room, that he'd take the weight for the car * * * I didn't pay attention to the gist of the conversation between him and O'Connor." Both statements were clearly made after his arrest, and, indeed, away from the scene. It was in his conversation with O'Connor that defendant first made mention of the friend in Puerto Rico. In this regard, during redirect examination, Officer O'Connor testified as follows:

"At any time did you question [defendant] with respect to ownership of the vehicle?

"A. Yes, I did.

"Q. And what did he say?

"A. [He] told me that the vehicle belonged to someone who was in Puerto Rico.

"Q. And what else did he tell you with regard to his possession of the vehicle?

"A. He told me that he borrowed it."

Thus, based upon Officer Biller's testimony as to the positioning of the officers at the time of the initial encounter and Officer O'Connor's testimony, it is clear that the only time that Officer O'Connor questioned defendant was at the station house, long after the arrest. Only then did he assert that he had borrowed the car.

213.) His "right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter" *(supra,* at p 219). When Officers Biller and O'Connor saw the vehicle parked next to a fire hydrant they had the right to approach and inquire and even issue a traffic summons, if they chose. It is only their subsequent conduct after Ms. Martinez failed to produce a license or an automobile insurance card that defendant attacks. In my view, however, even assuming defendant's standing to challenge that conduct, the officers' actions were justified.

The suppression court found that the LeMans was parked by a fire hydrant when it was first observed by the officers, that Ms. Martinez, who was sitting in the driver's seat, was unable to produce a driver's license, and that, although a registration card was handed to Officer O'Connor, Ms. Martinez stated that she did not know the name of the vehicle's owner. Indeed, Officer O'Connor, a member of the Bronx Task Force's Auto Larceny Prevention Unit, indicated that the car's occupants would have been taken to the police station under "technical" arrest in any event, pending clarification of the legitimacy of their possession of the car. Thus, even if these circumstances did not provide Officer O'Connor with probable cause to believe that the car was stolen, his inspection of the paper bag was a reasonable safety precaution pending his investigation of the traffic infractions and the possibility that the car was stolen. Recognizing the inordinate danger facing police officers as they approach persons seated in automobiles during routine and investigatory traffic stops, courts have sanctioned protective searches of automobile compartments. *(See, e.g., Michigan v Long,* 463 US 1032, 1049; *People v David L.,* 56 NY2d 698, *supra; People v Hines,* 102 AD2d 713, 714; *People v Clements,* 88 AD2d 541, 542.) For that reason, even in the absence of probable cause to believe that the occupants of a stopped car have committed or are about to commit a crime, it has been held that: "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons * * * '[T]he issue is

whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' " *(Michigan v Long,* 463 US, at pp 1049-1050; *see, People v De Jesus,* 92 AD2d 521, 522 [police officer acted properly in touching bag in car as a precautionary measure].)

That the encounter here took place at night in a "high-hazard", drug-infested neighborhood was an articulable fact that justified Officer O'Connor's concern for his safety. *(See, People v Hines,* 102 AD2d 713, *supra; People v Clements,* 88 AD2d 541, *supra.)* The officer's concern was heightened when he determined that Ms. Martinez was not the car's owner, and that, although she produced a registration card, she did not know the owner's name. These circumstances, at the very least, gave Officer O'Connor cause to suspect that the car's occupants were guilty of more than a mere traffic infraction. *(See, People v Hines,* 102 AD2d 713, *supra; cf. People v Marsh,* 20 NY2d 98, 101; *see also, People v King,* 102 AD2d 710 [frisk conducted before issuance of appearance ticket for noncriminal violation held permissible].)* Viewing these facts in the light of his testimony that he had previously been in situations where, in the course of a car stop, the occupants had drawn guns secreted in paper bags, Officer O'Connor was justified in securing himself and his fellow officer against the risk that the paper bag that lay between Ms. Martinez and defendant contained a weapon.

Thus, the suppression court ignored its own factual findings when it concluded that the officers did not have any reason to suspect that the car's occupants were guilty of a crime, as opposed to a mere traffic infraction. Moreover, its finding that the officers had failed to articulate a reason for fearing that the occupants were armed is, in view of Officer O'Connor's testimony, belied by the record. While the officers may, as the suppression court noted, have considered the incident routine at its inception, since they neither drew their guns nor ordered the suspects to keep their hands in sight or to exit the car, it is also a fact, as every police officer knows, that street encounters have the potential to escalate rapidly and become increasingly dangerous. Circumstances, not immediately apparent, may subsequently develop to threaten an officer's security and belatedly change his initial perceptions. *(See, e.g., People v Benjamin,* 51 NY2d 267, 270-271; *People v Stone,* 86 AD2d 347, 350.)* The suggestion that Officer O'Connor, in a nighttime confrontation in a crime-ridden neighborhood,

should have ignored his past experience as he stood beside an illegally parked automobile, the purported driver of which could not identify its owner, just because he had not seen any bulges, furtive gestures, or "glint of steel", asks too much of a police officer. Officer O'Connor, facing "the dangers of the real world where the Marquis of Queensbury rules do not apply" *(People v Rivera,* 78 AD2d 327, 331, *appeal dismissed* 54 NY2d 1021; *accord, People v Stone,* 86 AD2d, at p 347), did not have to invite further danger before acting to neutralize the threat which he reasonably perceived.

Furthermore, Officer O'Connor's protective actions were entirely consonant with the increasing weight of the "precipitating and attendant factors". *(People v De Bour,* 40 NY2d, at p 223.) Even accepting, arguendo, the suppression court's finding that he demanded to see what the bag contained,[2] it is significant to note that Officer O'Connor did not immediately reach into the bag when it was handed to him. Instead, he shook it first. Only after he heard a metallic sound inside, a circumstance which increased the likelihood that the bag contained a hidden weapon, did he examine its contents. At that juncture he could not ignore the glassine envelopes which appeared to him to be decks of contraband. Since it is a well-known fact that guns are a frequent companion of drugs *(see, People v Hines,* 102 AD2d, at p 714; *People v Stone,* 86 AD2d, at p 349; *People v Castro,* 80 AD2d 535, 536), the officers had little time for further reflection, or a closer inspection of the envelopes, before frisking the car's occupants. Since "the task of balancing the competing interests presented" turns on the reasonableness of police conduct viewed as a whole, rather than a dissection of each of its parts *(People v Chestnut,* 51 NY2d, at p 23; *People v De Jesus,* 92 AD2d, at p 522), the suppression court erred in finding that defendant had been subjected to an unconstitutional search.

Aside from the seizure of the paper bag and the examination of its contents, the suppression court was apparently untroubled by the remainder of the police officers' conduct since it based its suppression of the drugs found on defendant's person and his statements only on the ground that they represented the "fruits" of the initial seizure. Thus, it told the

---

2. Officer O'Connor, insisting that he merely inquired as to what was in the bag, denied that he ever told Ms. Martinez to give him the bag. While the People challenge the suppression court's finding as lacking an evidentiary basis and ask that it be rejected, this is an issue that need not be reached.

prosecutor that it would be unnecessary to recall Officer Biller for further testimony about the search of defendant's person, and it foreclosed the prosecutor's arguments concerning the voluntariness of defendant's statements with the observation that "if the search is fine, everything else will be fine—there's nothing wrong with the *Huntley.*" Indeed, defense counsel concurred in the latter conclusion.

Accordingly, since defendant failed to demonstrate his standing to challenge the seizure of the paper bag and, in any event, since the seizure and inspection thereof, as well as Officer Biller's subsequent frisk, were justified, the motion to suppress physical evidence and statements should be denied and the matter remanded to Trial Term for further proceedings.

FEIN and ELLERIN, JJ., concur with KASSAL, J.; KUPFERMAN, J. P., and SULLIVAN, J., dissent in an opinion by SULLIVAN, J.

Order, Supreme Court, Bronx County, entered on June 4, 1984, affirmed.