■ In the Matter of DALMIN M., a Person Alleged to be a Juvenile Delinquent, Appellant. [607 NYS2d 637] —Order of disposition of Family Court, New York County (Sheldon M. Rand, J.), entered January 19, 1993, pursuant to a fact finding order of the same court, entered December 31, 1992, finding that the appellant committed acts which, if committed by an adult, would constitute the crimes of criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree and criminal possession of a weapon in the fourth degree, which adjudicated the appellant a juvenile delinquent and placed him in the custody of the New York State Division for Youth, Title II, for a period of 18 months, affirmed, without costs.

Plainclothes police officers assigned to the 28th Precinct's robbery apprehension program were patrolling after dark in a marked police car when they received a radio run from the neighboring 25th Precinct reporting an attempted robbery of a livery cab by two perpetrators who were armed with semiautomatic weapons and had fled northbound on Madison Avenue. The transmission contained a description of the suspects which included their heights, gender, clothing and race. Approximately 10 minutes later the officers saw the appellant standing with two other males on the corner of 119th Street and Fifth Avenue; this location was three blocks north and one block west of the site of the attempted robbery. The officers' attention was drawn by the individuals because the appellant and one of the two other men fit the general description given in the radio run. The officers stopped at a stop sign and looked at the group from a distance of approximately 10 feet. Before the officers pulled over or said anything

to the individuals, the men fled. Appellant was apprehended after a one to two minute chase during which the appellant discarded a handgun. The weapon was recovered and found to be a loaded operable .25 calibre automatic handgun.

The information available to the arresting officers was unquestionably sufficient to provide them with a founded suspicion that criminal activity was afoot, giving rise to the common law right to inquire (People v Benjamin, 51 NY2d 267, 270). In particular, the difference in height between appellant and the other individual who matched the description of one of the suspects was consistent with the information received (see, People v Clee, 89 AD2d 188, 190, appeal dismissed 61 NY2d 899). It is significant also that appellant and his companions were seen approximately 10 minutes after the radio report, near the scene of the attempted robbery and that no other groups of individuals matching the description of the suspects were seen by the officers during their search of the area (People v Mingo, 121 AD2d 307, 309).

Although the dissent concedes that information, such as that with which the officers herein were provided, "provides the police with a common law right to inquire", it nevertheless concludes that the pursuit of the appellant's and his cohorts was unjustified. The dissent focuses on the fact that no weapons, narcotics, telltale bulges or other indications of criminality were observed, and on the appellant's "right to refuse to speak to the police" in order to conclude that appellant's flight upon the officers' "approach" did not create a reasonable suspicion of criminal activity necessary to justify the pursuit. This analysis ignores an important distinguishing factor present in this case. Here, the appellant and his companions whose description generally fit that description the police received on the radio, fled immediately upon seeing the officers' vehicle come to a stop at a stop sign. There is no evidence that the officers said anything or made any move toward the appellant and his cohorts prior to their flight. While citizens certainly have the right to refuse to speak to police, the immediate flight of an individual such as the appellant should not be minimized as an escalating factor (People v Martinez, 80 NY2d 444, 448; People v Leung, 68 NY2d 734; People v Benjamin, supra, at 270). Flight prompted by nothing more than the mere sight of police, under circumstances similar to those presented herein, has been found sufficient to escalate police officers' founded suspicion to the reasonable suspicion necessary to justify pursuit (People v Jackson, 172 AD2d 561, lv denied 78 NY2d 1077; Matter of

*Jerry C.,* 197 AD2d 685). It is not unreasonable for officers to suspect that individuals, who are the only ones observed within close temporal and spacial proximity to a reported crime who bear a reasonable resemblance to the description received over the radio and who run merely at the sight of police, may be connected with the reported crime.

Consequently, the appellant's discard of the weapon during the chase cannot be said to have been precipitated by any illegal police conduct *(People v Martinez, supra,* at 448-449; *People v Boodle,* 47 NY2d 398, *cert denied* 444 US 969; *People v Butler,* 184 AD2d 305, *lv denied* 80 NY2d 927). Concur—Ross, Asch and Williams, JJ.

Rosenberger, J. P., and Ellerin, J., dissent in a memorandum by Rosenberger, J. P., as follows: Since the record clearly establishes that the officer exceeded his authority in pursuing the respondent and that the respondent discarded the weapon in direct response to such illegality, I would reverse the order of the Family Court, grant the motion to suppress and dismiss the petition.

The radio report received by the officers at 9:55 P.M. indicated that the attempted robbery had been committed by two perpetrators. One was described as a black male, five feet, five inches tall, wearing glasses, a black jacket and blue jeans. The other was described as an hispanic male, six feet, four inches tall, wearing a black jacket, blue jeans and a green cap.

At 10:15 P.M., the officers, who were canvassing the area for the suspects, saw three men standing on the corner of 119th Street and Fifth Avenue. One of the men, the respondent, was black, five feet, four inches tall, and was wearing a black fatigue coat, black pants, black boots, a white sweatshirt and a white baseball cap. Another of the men was wearing a black coat and black pants. Police Officer Gloffke, who testified at the hearing, described this individual as being either an hispanic or light-skinned black man.

Officer Gloffke stopped his marked patrol car. The three men, upon seeing the police, began to run, with the respondent entering an alley. Gloffke followed in his car, stopped it in front of the alley and continued to pursue the respondent on foot. As the chase continued, Gloffke saw him throw a gun to the ground. He was eventually apprehended and placed under arrest.

Pursuit of an individual by police officers "significantly impede[s]" that person's freedom of movement and must be justified by a reasonable suspicion that a crime has been, is

being or is about to be committed *(People v Martinez,* 80 NY2d 444, 447; *see also, People v Madera,* 189 AD2d 462, *affd* 82 NY2d 775; *People v Holmes,* 181 AD2d 27, *affd* 81 NY2d 1056). While flight, combined with other specific circumstances indicative of criminality, may provide the necessary predicate to justify pursuit *(People v Holmes, supra),* "[a]n anonymous tip which gives a general description and location of a man with a gun does not generate reasonable suspicion warranting a stop and frisk of anyone who may happen to meet the description" *(People v Gaines,* 159 AD2d 175, 177, *lv withdrawn* 76 NY2d 986). Such information merely provides the police with the common law right to inquire *(supra).*

Although the radio report was received from a police precinct, the source of the information was unknown, and the description of the perpetrators provided was not only general, it differed significantly from the appearance of the respondent and the men standing with him. The respondent wore black pants, not blue jeans, and was not wearing glasses. When apprehended, he was wearing a white cap and a white sweatshirt, distinctive items of clothing not contained in the transmitted description. The description of the second perpetrator, which was also general, failed to match the companion of the respondent, who, contrary to the report, was six feet tall, wore black pants, and whom Gloffke did not recall wearing a green cap. Two men were reported to have attempted the robbery. When observed by the officers, however, the respondent was in the company of two other men.

The information provided was not " 'so specific and congruous with that which was actually encountered that its reliability reasonably could [be] assumed' " *(People v Bond,* 116 AD2d 28, 31, *lv denied* 68 NY2d 767). Further, there were no additional indicia of criminality to justify a reasonable suspicion that the respondent had committed a crime. No gun, narcotics, bulge, or movement suggesting that a weapon might be used, were seen. The respondent had a right to refuse to speak to the police. His flight upon their approach did not create a reasonable suspicion of criminal activity *(People v Madera, supra; People v May,* 81 NY2d 725; *People v Martinez, supra; People v Howard,* 50 NY2d 583, *cert denied* 449 US 1023).

The respondent's act of discarding the gun while being pursued illegally was "a spontaneous reaction to a sudden and unexpected confrontation with the police" *(People v Boodle,* 47 NY2d 398, 404, *cert denied* 444 US 969; *and see, People v*

*Madera, supra; People v Holmes, supra).* Suppression was, therefore, required.