■ In the Matter of JOSE R., a Person Alleged to be a Juvenile Delinquent, Appellant. [625 NYS2d 494] —Order of disposition of Family Court, Bronx County (Marjory D. Fields, J.), entered November 9, 1993, which adjudicated the respondent a juvenile delinquent and placed him under the supervision of the Department of Probation for a period of twelve months, pursuant to a fact-finding determination that the respondent-appellant committed an act, which if committed by

an adult, would constitute the crime of criminal possession of a weapon in the fourth degree, affirmed, without costs.

At the *Mapp* suppression hearing in this case, Officer John Gogarty testified that he was on routine radio motor patrol with his partner, Officer Fallon, in the vicinity of 1610 Walton Avenue in Bronx County at 12:45 P.M. on July 18, 1993 when the officers received a radio run reporting a "male, Hispanic with a sun visor, red shirt, black pants with a gun in his waist". The officers arrived at 1610 Walton Avenue approximately five minutes later and, according to Officer Gogarty, observed that respondent-appellant, who was standing in front of the address stated in the report, exactly matched the description received over the radio. Officer Gogarty testified that as the patrol car slowed down at the address in question he said to his partner "[t]here's a male that fits the description". The officers exited their vehicle and approached the respondent-appellant. Officer Gogarty testified that, as he and Officer Fallon approached the respondent-appellant, who was facing out toward the street, he observed a bulge at the respondent-appellant's waist that appeared to him to be a gun. According to Officer Gogarty, Officer Fallon reached the respondent-appellant first, immediately reached into the respondent-appellant's waistband and removed a .38 caliber revolver in a holster.

It has long been held in this State, that a "police officer is entitled, and in fact is duty bound, to take action on a radio call" *(People v Benjamin,* 51 NY2d 267, 270). Contrary to the characterization of the radio call by the dissent, as merely an "anonymous radio transmission of a male with a gun at 1610 Walton Avenue", the information conveyed by the radio call here "was so specific and congruous with that which was actually encountered that its reliability reasonably could have been assumed" *(People v Benjamin, supra,* at 270). The respondent-appellant was standing at the exact location noted in the radio call and was distinctively dressed, wearing a red shirt, sun visor and black pants. Furthermore, Officer Gogarty's testimony in which he described defendant as "a male, Hispanic standing next to the building wearing a sun visor, red shirt, black pants" went unchallenged on cross-examination. The officers were in close proximity to the defendant and had an unobstructed view. Consequently, given the exactness with which the officers' observations matched the facts transmitted in the radio call, both officers were completely justified in assuming that the defendant was the armed suspect described

in the radio call *(People v Benjamin, supra; People v Patterson,* 165 AD2d 673, *lv denied* 76 NY2d 989).

Given the testimony by Officer Gogarty that Officer Fallon was "a step closer" to the respondent-appellant it can be reasonably inferred that Officer Fallon had at least as clear a view of the respondent-appellant as did Officer Gogarty. While the dissent apparently concludes that there was no testimony regarding Officer Fallon's quick seizure of the weapon, we note Officer Gogarty's consistent testimony, despite repeated questioning by defense counsel, that he did not pat down the defendant and that upon reaching the defendant, Officer Fallon "reached right in and pulled the gun out". On cross-examination the following exchange occurred:

"Q: Did your partner pat Jose down?

"A: I just observed him reach in and pull a gun out of his waist band.

"Q: Did he say anything to Jose before he did that?

"A: Not that I can recall."

Later in the cross-examination defense counsel asked:

"Q: Did you pat Jose down?

"A: No.

"Q: Well didn't you see your partner pat Jose up and down his body?

"MR. ETKIND: Objection.

"THE COURT: Sustained asked and answered."

Officer Gogarty's answer to defense counsel's question as to whether Officer Fallon conducted a pat down, while not the explicit or emphatic denial required by the dissent, is a clear statement of what occurred. The statement—"I just observed him reach in and pull a gun out of his [defendant's] waist band"—cannot under any interpretation, however strained, be read to mean that the discovery of the weapon was a result of a pat down. The statement means exactly what it says, no more no less. To conclude, as the dissent does, that Officer Gogarty's statement was "simply a statement of what it [the alleged pat down by Officer Fallon] yielded", is to put words into Officer Gogarty's testimony that simply are not there. It is from Officer Gogarty's repeated statements that Officer Fallon reached in and grabbed the weapon that we conclude that the officer reached to the exact spot where the weapon was positioned and seized it.

The dissent also relies upon the testimony concerning the Stop and Frisk Report prepared by Officer Fallon, to conclude

that no weapon was seen by Officer Fallon prior to his seizure of the gun and, as further support for the conclusion that a frisk or pat down had to precede the seizure of the gun in this case. We note first that the report in question was not submitted to us on appeal. Second, there is no testimony in the record as to the contents of the report, except for the testimony that there is no mention in it of a bulge being seen by either officer. Third, the complete version of the question asked by defense counsel, which is relied upon by the dissent, to suggest that Officer Gogarty conceded that the Stop and Frisk Report contained a statement that the defendant was searched in order to locate the weapon, is as follows:

"Q: When you fill out a report, stop and frisk report; amongst the things included, is the fact that you include in it to believe that person should be stopped and frisked; correct?

"A: Correct."

Thus, it is plain that Officer Gogarty's testimony, relied upon by the dissent, concerns what is generally put into such a report and cannot be relied upon in any way as evidence of what was actually contained in the Stop and Frisk Report here in question. This interpretation of the testimony is substantiated by defense counsel's next question after the one quoted above, in which defense counsel specifically refers to the report in question stating: "And, your partner didn't mention in *this stop and frisk report* that either you or he had seen a bulge in my client's waistband; isn't that correct?" (Emphasis supplied.)

Therefore, with respect to the question of whether a pat down occurred in this case, the report is silent. The denomination of the report as a "Stop and Frisk Report" and the fact that the officer, who did not prepare the report in this case, testified as to what is usually contained in such a report, do not constitute evidence that Officer Fallon had to search defendant for a weapon he did not readily see. The only evidence we have is Officer Gogarty's testimony that Officer Fallon "reached * * * in and pulled the gun out". We note also, that the use by the Presentment Agency and the defense in their briefs, of the terms, "frisk", "pat down" and "limited search", etc., to describe the seizure of the weapon also do not constitute evidence; the terms are words of art universally used to describe these street encounters between the police and the general public. The specific manner and attendant circumstances of each "stop and frisk" are unique, and we evaluate these encounters on a case by case basis. In our

evaluation of this encounter we are concerned with what actually occurred as shown by the evidence in the record and not, as the dissent seems to be, with semantics.

The evidence present in this transcript, the labored interpretation of the record by the dissent notwithstanding, points inexorably to the conclusion that Officer Fallon clearly saw the gun and acted upon his own observation. Indeed, there appears to have been no opportunity for Officer Gogarty to communicate that he saw a bulge to Officer Fallon. In fact, the lack of such a communication demonstrates the speed at which the seizure of the weapon took place and that Officer Fallon saw the gun on his own. Considering the totality of circumstances, we conclude that Officer Fallon acted reasonably to safeguard his and his partner's safety. "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety" *(People v Benjamin, supra,* at 271). Concur—Ross, Asch and Nardelli, JJ.

Murphy, P. J., and Rosenberger, J., dissent in a memorandum by Rosenberger, J., as follows: I would reverse, granting the respondent's motion to suppress the weapon. At about 12:45 in the afternoon, in response to an anonymous radio transmission of a male with a gun at 1610 Walton Avenue, Officer Gogarty, who testified at a subsequent *Mapp* hearing, and his partner Officer Fallon proceeded to the location. Upon arrival, Officer Gogarty observed the respondent, matching the reported description. The two officers approached him from opposite directions. He made no attempt to flee. From his vantage point, Officer Gogarty observed a bulge on the right side of the waistband of the respondent, which appeared to him to be a gun. Moments later, Officer Fallon removed a gun from the respondent's pants. Officer Gogarty did not communicate that he had seen a bulge to his partner before the gun was retrieved, and the Stop and Frisk report prepared by Officer Fallon did not mention an observation of a bulge.

Analyzing the encounter by reference to the information which Officer Fallon had at the time he reached into the respondent's waistband, his intrusion was unjustified. The anonymous tip provided this officer with no more than a common law right to inquire of the suspect *(People v Benjamin,* 51 NY2d 267, 270; *see also, People v Gaines,* 159 AD2d 175).

Neither the respondent's reaction to the police presence on the scene, nor other attendant circumstances and exigencies provided Officer Fallon with any escalated right to intrude.

The respondent did not attempt to flee when the police approached *(see, Matter of Dalmin M.,* 201 AD2d 343, *appeal dismissed* 83 NY2d 883).* It was broad daylight. There were two officers. There was no unusual or furtive conduct which could have provided reasonable suspicion of criminal activity *(People v Bond,* 116 AD2d 28, *lv denied* 68 NY2d 767).

Officer Gogarty's observation of a bulge at the respondent's waist cannot be imputed to Officer Fallon to escalate his right to intrude, because there was no evidence that Officer Gogarty communicated this observation to his partner, in any way *(People v Mitchell,* 185 AD2d 163, 164, *appeal dismissed* 81 NY2d 819; *People v Mims,* 205 AD2d 78, 83, *lv granted* 84 NY2d 1017).* While the police are permitted to rely on the direction of their fellow officers to arrest, without simultaneously knowing the underlying facts which lead to such direction, they cannot be considered to have relied on information possessed by others without there having been any communication of either the information itself or a direction to arrest *(supra; see also, People v Brnja,* 50 NY2d 366, 373, n 4).

Absent from the record is testimony that Officer Fallon (who did not appear at the hearing) "reached to the exact spot where the weapon was positioned and seized it". It is upon this unsupported allegation by the majority that they conclude that Fallon saw the bulge. There simply was no such evidence.

The majority's factual conclusion is speculative, concededly based on inference. That conclusion is, in the circumstances, puzzling since it is not in keeping with the presentment agency's consistent position. On appeal, the presentment agency's sole point heading maintains that the officer had "reasonable suspicion to *frisk* the appellant." (Emphasis supplied.) Their brief uses the word "frisk" thirteen times, "pat down" twice, and "limited search" or "limited protective search" five times. The agency's conclusion to its brief is that "the Family Court correctly upheld the lawfulness of the *frisk*" (emphasis supplied).

The majority note what they characterize as "Officer Gogarty's consistent testimony" that no pat down occurred. As can be seen from the questions and answers quoted in their opinion, there was no such testimony. To be sure, Office Gogarty testified that *he* conducted no "pat down". His answer to the question regarding a "pat down" by Officer Fallon was *not* a denial that it had occurred, simply a statement of what it yielded.

Immediately following the first pair of questions quoted by the majority, there appears the following:

"Q: Well, how far were you from Jose when your partner searched him?

"A: I was right on the other side of him."

The sole testifying officer further conceded that his partner had prepared a "stop and frisk report" and that such a report (which here did not mention any sighting of a bulge) contains "the fact that you include in it to believe that [a] person should be stopped and frisked".

Because there was no evidence that a bulge in the respondent's waistband was ever observed by Officer Fallon, and because the attendant circumstances provided him with no more than a common law right to inquire, which he failed to exercise, the weapon which was retrieved from the respondent should be suppressed.