People v Scott (2023 NY Slip Op 02769)

People v Scott

2023 NY Slip Op 02769

Decided on May 23, 2023

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: May 23, 2023

Before: Manzanet-Daniels, J.P., Singh, Moulton, Rodriguez, Pitt-Burke, JJ. 

Ind. No. 4373/15 Appeal No. 191 Case No. 2018-5596 

[*1]The People of the State of New York, Respondent,
v
Mike Scott, Defendant-Appellant.

Caprice R. Jenerson, Office of Appellate Defender, New York (Joseph M. Nursey of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York (Amanda Katherine Regan of counsel), for respondent.

Judgment, Supreme Court, New York County (Abraham L. Clott, J.), rendered November 30, 2017, convicting defendant, upon his plea of guilty, of criminal possession of a weapon in the second degree, and sentencing him to a term of four years, unanimously reversed, on the law, the motion to suppress granted, and the indictment dismissed.
At the suppression hearing, the People presented testimony from two of the plainclothes anticrime police officers, Officers Burpeo and Santiago, who arrested defendant in the early morning hours of March 22, 2015. The testimony indicated that at least two other officers, including their sergeant, were present for the car stop and arrest. Defendant was in the front passenger seat of the stopped car.
The officers testified that they noticed the vehicle, a gray Ford Fusion with West Virginia license plates and very dark tinted windows, because it had previously been observed in the vicinity. As the officers followed the car, they observed it make a turn without signaling and shortly afterward park in front of a fire hydrant, at which point the officers activated lights and sirens, initiating a car stop. The officers testified that they could not see inside the vehicle. However, as they approached, they observed the car's suspension moving, indicating changes in its weight distribution.
The sergeant approached the driver's side of the vehicle, and Officer Burpeo approached the passenger's side. As the sergeant asked for the driver's license and registration, Officer Burpeo knocked on the front passenger window asking defendant to roll down his window. Defendant appeared to ignore the request as he yelled at the driver to not talk to the police or give them anything; Officer Burpeo testified that defendant seemed like he "didn't want to deal with anybody coming to his car." After "minutes [or] moments," the driver was asked and complied in stepping out of the vehicle. Defendant then rolled down his window, and Officer Burpeo observed him to be eating Popeyes chicken from his lap. Officer Burpeo further testified that he never saw defendant or the driver turn to the back seat of the vehicle.
Defendant then complied with a directive to exit the vehicle, whereupon Officer Burpeo frisked him, finding nothing on defendant's person. Officer Burpeo directed defendant to remain standing at the back of the car alongside the driver; neither was handcuffed. Officer Burpeo testified that while behind the bumper, he made conversation with defendant and the driver, and defendant made eye contact and "seemed a lot more relaxed."
As the sergeant and Officer Burpeo stood with defendant and the driver behind the bumper, Officer Santiago searched the vehicle, checking under the front passenger seat, then the driver's side, and finally the rear seat. On the back seat behind the driver's side, he observed an open purse. When he moved it, he noticed that it was extremely heavy. After shining his flashlight in the open bag, he saw the butt [*2]of a gun protruding from the top.
In an oral decision, the court denied defendant's suppression motion in its entirety. We now reverse.
Initially, the record supports the court's finding that the officers lawfully stopped the car in which defendant was riding after they observed several traffic infractions. The stop was permissible regardless of the officers' subjective motivations (see People v Robinson, 97 NY2d 341, 349 [2001]).
However, the warrantless sweep of the car, including the seizure of the purse found on the back seat of the vehicle, does not fall within any exception to the warrant requirement and was therefore unconstitutional.
The police have authority to order occupants out of a vehicle in the event of a traffic violation (see People v Garcia, 20 NY3d 317, 321 [2012]). Absent probable cause, the police are allowed to conduct a limited intrusion into the vehicle only if the totality of the information available supports a reasonable conclusion that there is a substantial likelihood of a weapon within the vehicle that poses an actual and specific threat to the officers' safety (see People v Carvey, 89 NY2d 707, 711 [1997]; People v Newman, 96 AD3d 34, 42 [1st Dept 2012], cert denied 568 US 1132 [2013]). Indeed, the Court of Appeals has described this exception to the probable cause requirement as "narrow" (People v Carvey, 89 NY2d at 710).
Furtive movements "suggesting that the defendant was reaching for something that might be a weapon" combined with some other suggestive factor have been determined to meet this standard (see People v Newman, 96 AD3d at 42; see also People v Mundo, 99 NY2d 55, 59 [2002]). For example, in Newman, this Court held that, after removing all occupants from the vehicle and patting them down, the police were nevertheless justified in conducting a limited search of the area in the vehicle where they saw the defendant reaching. We reasoned that the movements observed by the officers as they approached the car suggested that the defendants could have been searching for something underneath their seats. These movements coupled with the defendant's (1) "decepti[ve]" conduct of pretending to be asleep despite the officers observing all passengers moving around when the vehicle was initially stopped, and (2) attempt to suspiciously reach underneath his seat after "perfunctorily opening and closing the glove compartment"—all while purportedly looking for the vehicle's registration—provided the officers with "ample reason to believe that [ ] there was a substantial likelihood that he had a weapon underneath his seat that [ ] posed an actual and specific danger to their safety" (id. at 37, 43). Notably, Newman emphasized that the movements observed by the officers when approaching the vehicle would alone not justify the intrusion into the vehicle, but that the "presence of additional factors justified the officers' reasonable suspicion that there could be a weapon in the vehicle that posed an 'actual and specific [*3]danger' " (id. at 43).
No such actual and specific danger was shown to exist in this case. The officers did not testify to seeing a bulge suggestive of a weapon, to seeing defendant reach for his waistband, or any other act of concealment beyond general descriptions of the car and defendant's movements, which were in any event explicable once the officer discovered that defendant had been eating. The officer conceded that when defendant rolled down the window, he was able to discern that he had "Popeye's food on his lap, but we didn't know that at first." Defendant hesitated only briefly before rolling the window down and complying with the officer's demands to show his hands and to step out of the vehicle. Taking a few "moments" to comply with an officer's orders does not rise to the level of furtive or suspicious activity so as to support a finding of an actual and specific danger to officer safety (see People v Thorne, 207 AD3d 73, 78-79 [1st Dept 2022] [equivocal behavior that is susceptible to innocent interpretation did not increase the level of suspicion so as to justify the forcible stop of the defendant]). Defendant, by the People's admission, responded to the officers' questioning and complied with their directive to exit the car. He was frisked outside of the vehicle and found not to possess any weapons. Defendant remained in full view of the officers, his demeanor described as "relaxed"; he made eye contact and did not otherwise appear suspicious.
Thus, the testimony at the hearing described a scene where "the police remained in full control at all times, where the occupants of the vehicle complied with the police officers' instructions, and where there was no objective indication that the defendant was either trying to conceal a weapon or was reaching for one" (People v White, 159 AD3d 741, 745 [2d Dept 2018], lv denied 31 NY3d 1089 [2018]), negating a finding that the search was justified (compare Mundo, 99 NY2d at 59 [officers observed the defendant stashing something, driver repeatedly disobeyed officers' commands, and the vehicle "nearly struck a pedestrian in its attempt to evade the police"]; People v Colon, 157 AD3d 437 [1st Dept 2018], lv denied 31 NY3d 982 [2018] [the defendant continually pushed against the lower dashboard area with his leg]; People v Hardee, 126 AD3d 626 [1st Dept 2015], affd 30 NY3d 991 [2017] [the defendant's "suspicious" actions, including "persistent" movements, "repeatedly" looking at the back seat, and refusal to follow directives, went beyond mere nervousness]; People v Shabazz, 301 AD2d 412 [1st Dept 2003], lv denied 100 NY2d 566 [2003] [the defendant reached under seat, pushed the officer's hand away from the area, and suddenly ran away]).
Further, the seizure of the purse was not permissible under the plain view doctrine. For the plain view exception to apply, the police must be lawfully in the place from which the object is viewed, the police must have lawful access to the object, and the object's [*4]incriminating nature must be immediately apparent (see People v Sanders, 26 NY3d 773, 777 [2016]), prerequisites which were not met in this case.
Inasmuch as defendant was not under arrest, the search cannot be justified as a search incident to a lawful arrest, as even the People concede. 
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: May 23, 2023