People v Torres (2024 NY Slip Op 04442)

People v Torres

2024 NY Slip Op 04442

Decided on September 12, 2024

Appellate Division, First Department

Rodriguez, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: September 12, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Anil C. Singh
David Friedman Julio Rodriguez III John R. Higgitt LlinÉt M. Rosado

Index No. 4909/13 Appeal No. 1793 Case No. 2015-2283 

[*1]The People of the State of New York, Respondent,
v
Victor Torres, Defendant-Appellant.

Defendant appeals from a judgment of Supreme Court, New York County (Larry Stephen, J., at suppression hearing; Richard D. Carruthers, J., at plea and sentencing), rendered December 10, 2014, convicting him of criminal possession of a controlled substance in the fifth degree, and sentencing him to a prison term of nine months.

Caprice R. Jenerson, Office of the Appellate Defender, New York (Rosemary Herbert of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York (Jennifer Covais and Christopher P. Marinelli of counsel), for respondent.

RODRIGUEZ, J. 

This appeal concerns the legality of a frisk that led to the discovery of eight postage-stamp-sized bags containing PCP in defendant Victor Torres's sock. On appeal, Mr. Torres argues that Supreme Court improperly denied his motion to suppress the physical evidence recovered from the frisk. We agree.
Three witnesses testified at the suppression hearing: Police Officers McDevit and Galarza for the People; and Jose Rodan, a passenger in the vehicle the night Mr. Torres was arrested, for the defense.
On June 14, 2013, at approximately 11:30 p.m., while stopped with other officers at the corner of Madison and Rutgers Streets in Manhattan for an unrelated incident, Officer McDevit observed Mr. Torres driving a minivan toward him playing very loud music. Officer McDevit, who was in uniform, entered his unmarked patrol car and followed the minivan, at which point he noticed the van make a left turn without a signal. Officer McDevit activated his lights and pulled the van over under the Manhattan Bridge because of Mr. Torres's failure to signal and the excessively loud music in a residential area. The lighting conditions were "very dark." After stopping the minivan, Officer McDevit observed it "moving up and down," "almost like [someone] was jumping up and down in the car," and "shaking." As he approached on the passenger side, he smelled the odor of PCP emanating from the van from about five to seven feet away. At the vehicle, Officer McDevit asked Mr. Torres, who was in the driver's seat, to roll down the windows. After giving this directive, he stood outside the minivan in silence. According to Officer McDevit's notes taken the night of Mr. Torres's arrest, the minivan was pulled over for loud music and failure to signal. The notes do not mention the smell of PCP.
Officer Galarza was also on the corner of Madison and Rutgers Streets, but in plainclothes, when he heard a vehicle with "music blasting," and he proceeded to follow Officer McDevit in an unmarked vehicle in pursuit of the minivan. Officer Galarza arrived under the bridge where the minivan was stopped 10 seconds after Officer McDevit. After leaving his vehicle, Officer Galarza immediately smelled the odor of PCP emanating in the air about 20 to 30 feet away from the minivan. He approached the driver's side of the van and asked Mr. Torres for his license and registration. When Mr. Torres was unable to produce the requested [*2]documents, Officer Galarza "had him step out of the vehicle for [Officer Galarza's] safety after [Officer Galarza] felt like [Mr. Torres] wasn't compliant enough" with the request. Although the driver's side window was down, the rear windows, which were tinted, were rolled up. Officer Galarza observed that Mr. Torres appeared "[n]ervous" and "fidgety." Officer Galarza testified that Mr. Torres made "no attempt" to retrieve the requested documents and that interacting with him was "almost like talking to a wall." Upon removing Mr. Torres from the van, Officer Galarza frisked him, which led to the discovery of the PCP in Mr. Torres's sock.
On cross-examination, Officer Galarza agreed that Mr. Torres did not hand him the license and registration "right away." Additionally, Officer Galarza testified that one of the van's passengers, Arthur Molina, was familiar to him because Mr. Molina was known to use PCP. He further stated that he had all passengers, not just Mr. Torres, step outside the vehicle once he recognized Mr. Molina.[FN1] Officer Galarza knew that the small Ziploc bags—which were inside a slightly larger bag located in Mr. Torres's sock—were not a gun, knife, taser, billy club, or can of mace. Rather, he thought the PCP could be a razor wrapped in a napkin. Officer Galarza stated that there were four to six police officers at the scene. Finally, Officer Galarza could not smell anything from the recovered PCP that was introduced at the hearing.
Mr. Rodan, who knew Mr. Torres for about 15 years, testified that he was sitting in the passenger seat of the minivan, that Mr. Torres was driving, and that there were two passengers in the back seat, one of whom was Mr. Molina. The van was playing loud music while driving toward a group of pedestrians and officers in the area. Officers followed the van and pulled it over under the Manhattan Bridge. After two officers approached the van, one informed them that the van was stopped because of the loud music and further asked Mr. Torres for his license and registration. Mr. Torres produced his license and registration, which an officer took with him back to the police vehicle. The officer subsequently returned the documents to Mr. Torres before advising him that he could go. At that point, an officer with badge number 11451 [FN2] recognized Arthur Molina in the back seat. Mr. Rodan reached back to roll up the rear window when Mr. Molina and the officer started arguing. The officer then drew his weapon, pointed it towards the door, and advised Mr. Rodan to leave the window alone.[FN3] All of the vehicle's occupants were directed to step out, at which point they were searched twice. Nothing was recovered when Mr. Torres was first patted down. However, the second search was conducted in a "rough[er]" fashion; although nothing was recovered from him, the second search left Mr. Rodan with his pants "pulled . . . down, more or less," his socks turned out, and one shoe off. At the conclusion of the stop, the van was released [*3]to Mr. Rodan. Mr. Rodan testified that he did not smell PCP in the minivan that evening and that every time he drives with Mr. Torres, Mr. Torres uses his signal.
In an oral decision from the bench, the court denied Mr. Torres's suppression motion. At the outset, the court found "Officer Mc[D]evit and Officer Galarza's testimony to be mostly credible and part of Mr. Rodan's testimony . . . to be credible," with other "parts . . . not . . . credible." The court concluded that the stop of the vehicle at Cherry and Pike Streets was lawful based on the loud music testified to by both officers and Mr. Rodan, coupled with Officer McDevit's testimony that he observed Mr. Torres make a left turn without signaling. The court further held that Mr. Torres's removal from the vehicle and subsequent pat down was "reasonable in that the area in question was dark, it was late at night, [and] the defendant's failure to be able to produce identification arose the officer's suspicion." Regarding both officers' testimony about the smell of PCP, the court stated:
Also, when you add the fact that there was the smell of PCP, whether you believe that or not, think [sic] the officer still had the basis to remove the defendant from the car and conduct a patdown for the officer's safety. So regardless of whether you believe that PCP was smelled by either one or both of the officers is not relevant.[FN4]
Mr. Torres was subsequently convicted upon his plea of guilty of criminal possession of a controlled substance in the fifth degree and sentenced to a jail term of nine months (Richard Carruthers, J. at plea and sentencing). We now reverse.
The rule of De Bour—New York's four-tiered framework used to evaluate police-civilian encounters with "escalating measures of suspicion necessary to justify each" level—undoubtedly "govern[s] [] encounters during lawful traffic stops" (People v Garcia, 20 NY3d 317, 324 [2012]; see People v Hinshaw, 35 NY3d 427, 432-433 [2020]).
At the first level, which is the least intrusive, a request for information "is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality" (People v De Bour, 40 NY2d 210, 223 [1976]; see People v Parker, 32 NY3d 49, 55 [2018]). The second level, "the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot" and allows "interfere[nce] with a citizen to the extent necessary to gain explanatory information, but [is] short of a forcible seizure" (De Bour, 40 NY2d at 223; see Parker, 32 NY3d at 56).
Level three, applicable to our analysis, permits "a forcible stop and detention" where the officer has "a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (De Bour, 40 NY2d at 223; see Parker, 32 NY3d at 56). "Reasonable suspicion represents that quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the circumstances [*4]to believe criminal activity is at hand" (People v Martinez, 80 NY2d 444, 448 [1992] [internal quotation marks omitted]). "The suspicion 'may not rest on equivocal or innocuous behavior that is susceptible of an innocent as well as a culpable interpretation'" (People v Thorne, 207 AD3d 73, 77 [1st Dept 2022], quoting People v Hinshaw, 35 NY3d 427, 438 [2020]).
"A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed" (De Bour, 40 NY2d at 223). To conduct a frisk absent probable cause, "[t]he officer must have knowledge of some fact or circumstance that supports a reasonable suspicion that the suspect is armed or poses a threat to safety" (People v Batista, 88 NY2d 650, 654 [1996]). Moreover, "[f]acts providing the police with reasonable suspicion justifying a forcible stop do not necessarily provide reasonable suspicion justifying a frisk" (People v Shuler, 98 AD3d 695, 696 [2d Dept 2012], citing People v Russ, 61 NY2d 693, 695 [1984]; see Batista, 88 NY2d at 654 ["Yet the propriety of a frisk is not automatic"]). "Relevant considerations in the determination of whether there is reasonable suspicion that the suspect poses a danger include, among others, the substance and reliability of the report that brought the officers to the scene, the nature of the crime that the police are investigating, the suspect's behavior and the shape, size, and location of any bulges in the suspect's clothing" (Shuler, 98 AD3d at 696). "[W]hether the police have reasonable suspicion depends on the entire circumstances of each case" (People v Reyes, 69 AD3d 523, 526 [1st Dept 2010], appeal dismissed 15 NY3d 863 [2010]; see also People v Rodriguez, 41 NY3d 1, 7 [2023]; People v Stephens, 47 AD3d 586, 588 [1st Dept 2008], lv denied 10 NY3d 940 [2008] ["the court must concentrate on whether the conduct of the police was reasonable at the time in view of the totality of the circumstances"]).
Finally, at the fourth and highest level of intrusion, a police officer may arrest a person if the officer "has probable cause to believe that person has committed a crime" (De Bour, 40 NY2d at 223; see Parker, 32 NY3d at 56).
"[A]ny inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions" (De Bour, 40 NY2d at 223). To that end, and in recognition of this analysis as one of the totality of the circumstances, "[d]iscrete analysis of each factor is inappropriate as the officers are confronted with only the complete set of circumstances" (People v Carvey, 226 AD2d 193, 193-194 [1st Dept 1996], affd 89 NY2d 707 [1997]).
Against that backdrop, we turn to the frisk at issue here. To begin, the police properly stopped the car, as Officer McDevit observed Mr. Torres commit a traffic violation (see People v Barriera, 191 AD2d 153, 155 [1st Dept 1993], appeal [*5]dismissed 81 NY2d 1040 [1993]). Additionally, police are permitted to order "the occupants of a car which has been lawfully stopped for a traffic infraction to leave it" (id., citing People v Robinson, 74 NY2d 773, 775 [1989], cert denied 493 US 966 [1989]). However, any further intrusion must be justifiable under De Bour (see People v Garcia, 85 AD3d 28, 31 [1st Dept 2011], mod on other grounds 20 NY3d 317[2012]).
The issue presented is therefore "whether the circumstances in this case support a reasonable suspicion that defendant was armed and dangerous" (Batista, 88 NY2d at 654), thereby justifying the level three frisk. More precisely, the issue is whether Mr. Torres's failure to produce his license and registration; his presentation as "nervous" and "fidgety"; the dark lighting under the Manhattan Bridge; the smell of PCP; and Officer McDevit's observation that the van was shaking as he approached supports, in the totality, "a reasonable view that [defendant] was armed" (People v Johnson, 40 NY3d 172, 176 [2023]).
Ultimately, the circumstances here supported, at most, a level two intrusion to gain explanatory information but not an escalation to level three. Critically, Officer Galarza testified that when he asked Mr. Torres for his license and registration, Mr. Torres was "not able to produce [them]." It was "[a]t this point" that Officer Galarza had Mr. Torres "step out of the vehicle [] for [Officer Galarza's] safety after [Officer Galarza] felt like [Mr. Torres] wasn't compliant enough" with the request.[FN5]
During the hearing, there was no testimony regarding how many times Officer Galarza asked Mr. Torres for his license and registration or how much time had elapsed between the unanswered inquiry and Mr. Torres being asked to step out of the vehicle. Further, there was no testimony as to whether Officer Galarza engaged in additional inquiry with Mr. Torres after the latter was unable to produce the requested documents. Significantly, Officer Galarza frisked Mr. Torres immediately after Mr. Torres stepped out of the vehicle. In other words, nothing occurred after Torres stepped out of the vehicle that could have served as an additional basis for reasonable suspicion that he was armed. Therefore, for the frisk to be lawful, it must be justified by the circumstances that occurred before Mr. Torres stepped out.
Here, Officer Galarza's request to see Mr. Torres's license and registration following a minor traffic infraction was a justified level one inquiry (see People v Thomas, 19 AD3d 32, 41-42 [1st Dept 2005], lv denied 5 NY3d 795 [2005]). However, "the circumstances prior to the stop itself justified no suspicion of criminal activity on the part of [the] occupant[s] other than failure on the driver's part to" signal the left turn as "[t]he car was not speeding or being driven in an erratic manner, and the driver responded promptly to the order to stop" (Barriera, 191 AD2d at 155).
Additionally, although Mr. Torres's failure to respond [*6]to Officer Galarza's request for his license and registration "clearly served to heightened the suspicions of the officer" (People v Gonzalez, 115 AD2d 73, 82 [1st Dept 1986], affd 68 NY2d 950 [1986]) and "represented a basis for further inquiry," "it did not provide a predicate for reasonable suspicion to believe that [defendant] . . . [was] armed, thereby justifying a frisk" (Barriera, 191 AD2d at 156; cf. People v Klass, 55 NY2d 821, 822 [1981] [frisk justified where the defendant said nothing in response to officer inquiry as to who the defendant was and what he was doing in the hallway of the building where the defendant matched the description and was in the location of a report provided to the officer 20 seconds earlier of a man with a gun]).
More to the point, Mr. Torres's failure to produce his license and registration, along with the other circumstances attending the encounter—namely, Officer McDevit's observation that the vehicle was shaking after being pulled over, the PCP odor, the poor lighting conditions, and Mr. Torres's nervousness —provided Officer Galarza with, at most, the founded suspicion that criminality was afoot. This, in turn, escalated the encounter from the request for information to the common-law right to inquire (cf. People v Hightower, 136 AD3d 1396, 1396-1397 [4th Dept 2016] [holding officer's escalation to level two unlawful even where driver, who was unlicensed, and the defendant, who was unable to produce identification, were removed from the vehicle, and the defendant "appeared fidgety, grabbed at his pants pockets, looked around, and gave illogical and contradictory responses to the officer's questions" when responding to level one inquiries]). Officer Galarza was therefore authorized to engage in "invasive questioning" (see People v Hollman, 79 NY2d 181, 191 [1992]).
Upon Mr. Torres's failure to respond, rather than engaging in further inquiry or investigation (e.g. running the vehicle's plates), the officers too hastily escalated the encounter from the common-law right to inquire to a level three frisk without the requisite reasonable suspicion (compare People v Barriera, 191 AD2d at 155-156, and People v Gonzalez, 115 AD2d at 82, with People v Stoller, 42 NY2d 1052, 1052-1053 [1977], and People v Perez, 142 AD3d 410, 414-415 [1st Dept 2016], affd 31 NY3d 964 [2018]).
Furthermore, despite the fact that both Officers McDevit and Galarza stated that the lighting conditions under the bridge were "very dark" and "dark," respectively, neither testified that Mr. Torres's appearance or movements were concealed by the darkness or that their visibility inside the vehicle was diminished by the poor lighting under the bridge specifically (see People v Russ, 61 NY2d 693, 695 [1984]).[FN6] In any event, even assuming that the lighting conditions reduced the officers' visibility, this factor, taken together with the various other circumstances present, including Mr. Torres's failure to respond to Officer Galarza's inquiry, [*7]was nevertheless insufficient to furnish Officer Galarza with a reasonable suspicion that Mr. Torres was armed with a weapon (cf. People v Graves, 142 AD3d 559, 560 [2d Dept 2016], lv denied 28 NY3d 1028 [2016]; People v Issac, 107 AD3d 1055, 1057-1058 [3d Dept 2013]; People v Griffin, 188 AD3d 1701, 1703 [4th Dept 2020], lv denied 36 NY3d 1050 [2021]).[FN7]
Moreover, the smell of PCP did not serve to escalate this encounter from level two to three. Simply put, taking into consideration the totality of the circumstances, and even fully crediting the officers' testimony—which the court below did not do—the PCP's odor did not serve to escalate the officers' level of suspicion from that of "a founded suspicion that criminal activity is afoot" (De Bour, 40 NY2d at 223) to "a reasonable suspicion that the suspect is armed or poses a threat to safety" (Batista, 88 NY2d at 654).[FN8] This is so given the absence of testimony suggesting the presence of a weapon, such as furtive movements, a bulge observed in Mr. Torres's waistband, Mr. Torres "blading" his body away from the police officer, or any other act of concealment (see People v Moret, 240 AD2d 321, 321-322 [1st Dept 1997], lv denied 90 NY2d 908 [1997]; People v Williams, 191 AD3d 1495, 1498 [4th Dept 2021] [evidence suppressed notwithstanding the defendant's "blading," or angling his body away from the officer, among other factors]).[FN9] People v Butler (127 AD3d 623 [1st Dept 2015]) provides support for the conclusion that the circumstances here, viewed in the totality, did not give rise to the reasonable suspicion that defendant was armed. In Butler, the defendant was the passenger in a vehicle that was stopped by the police at 9:00 p.m. in a "high narcotics area" (id. at 623). An officer noticed "defendant's head turning both ways and a lot of . . . movement coming from the area of the front passenger seat" (id.). When the officer approached, the defendant "appeared nervous, pulling his hand from his jacket, from the fold of his jacket" (id. [internal quotations marks omitted]). In response to the officer's question regarding what he had put in his jacket, the defendant "mumbled something unintelligible or didn't say much" (id.). The officer then reached into the vehicle and tapped the pocket of the defendant's jacket with a flashlight (id.). The officer felt "something hard," and he proceeded to order the defendant out of the car (id.). Upon conducting a frisk, the officer discovered a bag that contained a large number of loose pills (id.).
This Court found that "[t]he officer's observations, up until the time he arrived at the passenger window, gave rise to founded suspicion that criminality was afoot, and so justified his question regarding what defendant had put in his pocket, which constituted a common-law inquiry" (id. at 623-624). Nonetheless, this Court held that the tapping of the defendant's pocket was unauthorized because the "circumstances did not give rise to the reasonable suspicion required [*8]to authorize a frisk" (id. at 624). Continuing, this Court observed that "[a]t the time of the officer's intrusion, defendant was not reaching for an area where a weapon might be located, there was no suggestion that a weapon was present or that violence was imminent, and there was no other basis for a self-protective intrusion" (id.).
Similarly, during the suppression hearing, there was no testimony that Mr. Torres or any of the vehicle's other occupants reached for or attempted to secret anything or made any sudden, furtive movements. Additionally, there was no testimony elicited that the officers observed a bulge in any of the occupants' clothing that might have indicated the presence of a concealed weapon. Notwithstanding Mr. Torres's failure to produce the requested documents, his nervousness, the PCP's odor, the poor lighting conditions, and Officer McDevit's observation that the vehicle was shaking, it remains that Mr. Torres was pulled over for a noncriminal traffic infraction, there was no testimony that the officers' view of Mr. Torres was obstructed at any point, and, notably, the officers did not testify to any acts of concealment made by Mr. Torres or any of the vehicle's other occupants. All said, the testimony described a situation in which the four to six police officers at the scene remained in control at all times, and in which the occupants of the car—besides Mr. Torres's inability or refusal to produce his license and registration—complied with all of the officers' directives.[FN10]
Therefore, similar to Butler, in which this Court held the officer was justified to engage in common-law inquiry but not authorized to conduct a level three search, Officer Galarza was authorized to pointedly question Mr. Torres to obtain explanatory information when he was unable to produce his license and registration. The circumstances of the stop, however, did not give rise to a reasonable suspicion that Mr. Torres was armed, and the frisk was therefore unlawful.
The cases principally relied on by the People do not compel a different result. In People v Anderson (17 AD3d 166, 168-169 [1st Dept 2005]), although an occupant of the pulled-over vehicle refused to answer the officer's question about the presence of weapons, there were additional circumstances that, taken together, "clearly provided a reasonable objective basis" for the officer to "fear for his safety," thus justifying the intrusion into the car's console.[FN11] Namely, the officers observed "the vehicle make an illegal U-turn in the face of an obvious police presence, in an apparent attempt to avoid an encounter with the officers," and "furtive behavior" on the part of an occupant "which included bending and leaning toward the defendant driver while trying to adjust something in the center console" (id. at 168). Further, the occupant that was moving furtively "slammed the console shut and turned so that he was facing forward" as the officer neared the vehicle (id. at 167).
Unlike in Anderson[*9], where the circumstances suggested the vehicle's occupants not only wanted to avoid an interaction with the police but also conceal something from the officers' view, here there are no facts to suggest that Mr. Torres attempted to avoid police detection, or that he or any of the other occupants were secreting a weapon. Much the opposite, the record suggests that the music was not lowered even after the car's occupants noticed the officers.
Additionally, in People v Carr (305 AD2d 120, 121 [1st Dept 2003], lv denied 100 NY2d 593 [2003]), the search was lawful where defendant engaged in "furtive and suspicious behavior, including hiding his face, turning his back while reaching into his waistband and refusing to show his hands." As recounted above, in contrast to both Anderson and Carr, the officers here did not observe any furtive motion or movements indicative of concealment on the part of Mr. Torres or the other occupants of the minivan. Further, although Officer Galarza testified that at one point Mr. Torres removed his hands from the steering wheel, there was no testimony that Mr. Torres did not immediately return them to the wheel when instructed to do so or that Officer Galarza did not have a clear view of Mr. Torres's hands at all times.
Finally, in People v Nichols (250 AD2d 370, 370-371 [1st Dept 1998], lv denied 92 NY2d 881 [1998]), the defendant was "uncooperative," "his conduct was extremely suspicious," and he exhibited "severe" "agitation and nervousness . . . involving uncontrollable shaking and trembling" after "merely being detained for a simple violation" such that, "when combined with his failure to answer the officer's inquiry," there was "reasonable basis for believing that the defendant might be armed." Again, although Mr. Torres failed to answer Officer Galarza's inquiry regarding his license and registration, his conduct cannot fairly be categorized as "extremely suspicious" and his nervousness as "severe" such that, taken as a whole, a frisk would be justified as in Nichols (see People v Ross, 185 AD3d 1537, 1537-1538 [4th Dept 2020], lv denied 35 NY3d 1115 [2020] [level three frisk authorized where vehicle matched the description of a tip that indicated the presence of a firearm in the vehicle, the defendant "was very slow to answer routine questions," and the defendant's "hands were shaking and twitching as he was speaking"]).
Given the above, when viewed in the aggregate, the combined circumstances of this stop are insufficient to give rise to a reasonable suspicion that Mr. Torres was armed or posed a safety threat to the officers. Mr. Torres did not reach for his waistband (see People v Rivera, 286 AD2d 235, 235 [1st Dept 2001], lv denied 97 NY2d 760 [2002]), he did not have a bulge in his clothing in the outline of a weapon (see People v Brunson, 166 AD2d 204, 205 [1st Dept 1990]), and he did not engage in any furtive movements indicative of guilt or suggesting an attempt to reach for or secret a weapon (see People [*10]v White, 113 AD3d 532, 533 [1st Dept 2014], lv denied 24 NY3d 1048 [2014]).
Furthermore, far from responding to a report of an armed individual involved in a dispute (see People v Celaj, 306 AD2d 71, 72 [1st Dept 2003], affd 1 NY3d 588 [2004]; People v Herold, 282 AD2d 1, 7-8 [1st Dept 2001], lv denied 97 NY2d 682 [2001]) or some other violent crime, such as an armed robbery (see People v Garner, 196 AD2d 727, 727 [1stDept 1993]), the officers pulled Mr. Torres over for a routine, traffic infraction.
Undoubtedly, police face an "extraordinary vulnerability" in confronting occupants of a car (Barriera, 191 AD2d at 155). Nonetheless, "once those persons have left the car, the parties are in the same position as exist in any street encounter," and "the standard for justifying a frisk is well established" (id.; see Garcia, 20 NY3d at 324).
Under the circumstances here, we conclude that reasonable suspicion did not exist at the point Officer Galarza conducted the frisk, and the search was therefore improper.
Accordingly, the judgment of Supreme Court, New York County (Larry Stephen, J., at suppression hearing; Richard D. Carruthers, J., at plea and sentencing), rendered December 10, 2014, convicting defendant of criminal possession of a controlled substance in the fifth degree, and sentencing him to a term of nine months, should be reversed, on the law and the facts, the plea vacated, the motion to suppress granted, and the indictment dismissed.
All concur except Friedman, J. who concurs in a separate opinion.

Friedman, J. (concurring),
 

I concur in the reversal of the judgment based on CPL 470.15(1), which, as construed by the Court of Appeals, bars us "from affirming a judgment, sentence or order on a ground not decided adversely to the appellant by the trial court" (People v Concepcion, 17 NY3d 192, 195 [2011], citing People v LaFontaine, 92 NY2d 470 [1998]). In this case, although Officer Galarza, who frisked defendant, testified that he smelled the odor of PCP emanating from defendant's car and from defendant himself, Supreme Court did not clearly credit this part of the officer's testimony and did not rely on it in denying the motion to suppress the PCP found on defendant's person as a result of the frisk. In my view, the remaining factors (other than the alleged PCP odor) on which the People rely to justify the frisk did not, even in combination, give rise to reasonable suspicion that defendant was armed. I conclude, therefore, that the judgment should be reversed and the indictment dismissed.
The majority takes the position that we need not reach the LaFontaine issue because, in its view, "the motion should have been granted even when the testimony regarding the alleged PCP odor is considered and credited." I respectfully disagree. If Supreme Court had considered and credited the PCP testimony, the denial of the suppression motion would have been correct (see People v Carmona, 149 AD3d 670, 671 [1st Dept 2017] [police officer's [*11]search of the defendant was justified when, among other things, the officer "detected the odor of PCP"], lv denied 29 NY3d 1090 [2017]; People v Darby, 263 AD2d 112, 114 [1st Dept 2000] ["the odor (of PCP) was enough, when combined with the officers' other observations and knowledge, to give the officers probable cause for stopping and searching defendant"], lv denied 95 NY2d 795 [2000]; cf. People v Chestnut, 36 NY2d 971 [1975], affg 43 AD2d 260, 260 [3d Dept 1974] [after police stopped defendant's car, their search of the car and each of its occupants was justified by "the odor of marihuana smoke emanating from the vehicle"]; People v Salley, 205 AD3d 651, 652 [1st Dept 2022] ["Under the prevailing law at the time of this incident, the mere odor of marijuana justified the search of a car and its occupants"], lv denied 38 NY3d 1153 [2022]; People v Chapman, 164 AD3d 1181, 1181 [1st Dept 2018] [same], lv denied 32 NY3d 1109 [2018]; People v Smith, 66 AD3d 514, 514 [1st Dept 2009] [same], lv denied 13 NY3d 942 [2010]; People v Badger, 52 AD3d 231, 232 [1st Dept 2008] ["the distinctive odor of marijuana emanating from the vehicle . . . independently established probable cause to search the automobile and its occupants"], lv denied 10 NY3d 955 [2008]).
In my view, the majority does not successfully distinguish the authority cited above. To the extent the cited cases apply a "probable cause" standard, that standard is higher than the "reasonable suspicion" standard required to justify a frisk (see People v Parker, 32 NY3d 49, 56 [2018] [internal quotation marks omitted], citing People v DeBour, 40 NY2d 210, 223 [1976]). A fortiori, if the odor of an illegal drug satisfies the "probable cause" standard, the "reasonable suspicion" standard argued by the People, and applied by Supreme Court, is also satisfied.[FN12] Nor is it of any moment that the decisions on which I rely might focus on the odor of drugs as evidence of criminality, while Galarza testified in this case that he frisked defendant "for my safety." This is because the right of an officer to conduct a frisk for purposes of safety is a "corollary" of the officer's right to effect a forcible stop based on "reasonable suspicion" of criminality (Parker, 32 NY3d at 56 [internal quotation marks omitted], citing DeBour, 40 NY2d at 223).[FN13]
Judgment, Supreme Court, New York County (Larry Stephen, J., at suppression hearing; Richard D. Carruthers, J., at plea and sentencing), rendered December 10, 2014, should be reversed, on the law and the facts, the plea vacated, the motion to suppress granted, and the indictment dismissed.
Opinion by Rodriguez, J. All Concur except Friedman J. who concurs in the result by separate opinion.
Singh, J.P., Friedman, Rodriguez, Higgitt, Rosado, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: September 12, 2024

Footnotes

Footnote 1: Officer Galarza's testimony is not completely clear with respect to when he recognized Mr. Molina during the chain of events.
Footnote 2: Officer McDevit's badge number is 11451.
Footnote 3: Mr. Rodan's testimony regarding rolling up the window was given after the People rested in the hearing, and the two officers did not mention this exchange during their testimony (see e.g. People v Messano, 41 NY3d 228, 233 [2024] ["When a defendant moves to suppress evidence seized by the police, the prosecution initially bears 'the burden of going forward to show the legality of the police conduct in the first instance'"], quoting People v Berrios, 28 NY2d 361, 367 [1971]). In any event, at the hearing the People did not refer to Mr. Rodan's testimony concerning the window in arguing that the frisk was lawful, and Supreme Court likewise did not rely on Mr. Rodan's testimony in this respect. On appeal, the People similarly do not rely on this aspect of Mr. Rodan's testimony to support their position regarding the search's legality. Rather, they broadly submit that Mr. Rodan's testimony was "simply untrue."
Footnote 4: The People assert on appeal that "the court was correct that, notwithstanding the officers' testimony regarding the PCP odor in the air, there were a plethora of factors that, taken together, gave Officer Galarza reasonable suspicion that defendant was potentially dangerous [and] the odor of PCP only strengthened that inference." In reply, citing People v Concepcion (17 NY3d 192 [2011]), Mr. Torres contends that the odor of the PCP cannot be used to affirm the lower court's decision on appeal because "the court below specifically disavowed any reliance on the claimed odor of PCP, finding that it was not relevant to its evaluation of the legality of the police conduct."As enunciated in People v LaFontaine (92 NY2d 470 [1998]), CPL 470.15 (1) bars this Court from affirming a judgment "on a ground not decided adversely to the appellant by the trial court" (Concepcion, 17 NY3d at 195). Proper application of LaFontaine has, at times, presented somewhat of a thorny question (see People v Hill, 33 NY3d 1076, 1076-1078 [2019] [Fahey, J., Rivera, J., Wilson, J., dissenting]; People v Garrett, 23 NY3d 878, 898-899 [2014] [Smith, J., concurring]; People v Lam, 21 NY3d 958, 961 [2012] [Smith, J., dissenting]; People v Fernandez, 20 NY3d 44, 58 [2012] [Pigott, J., Smith, J., dissenting]; People v Ingram, 18 NY3d 948, 949-951 [2012] [Pigott, J., Smith, J., dissenting]; People v Alfaro, 19 NY3d 1075, 1078-1080 [2012] [Lippman, Ch. J., dissenting]; Concepcion, 17 NY3d at 201-207 [Smith, J., Pigott, J., dissenting]). This case is no different.
As recounted above, in rendering its decision, the court below explicitly found, regarding the smell of PCP, that "whether you believe that or not," "the officer still had the basis to remove the defendant from the car and conduct a patdown for the officers' safety" and that whether the PCP was smelled by one or both officers was "not relevant." Because, as discussed below, we find that the motion should have been granted even when the testimony regarding the alleged PCP odor is considered and credited, we have no occasion to determine whether the LaFontaine procedural bar is implicated here.
Footnote 5: During cross-examination, when asked if Officer Galarza instructed "everyone to step out of the car" after he recognized a back-seat passenger as Arthur Molina, who was familiar to Officer Galarza because of his PCP use, Officer Galarza responded that, "he had Victor [Torres] step out of the car." Upon further questioning, Officer Galarza clarified that all of the passengers were outside of the car, which aligns with Mr. Rodan's testimony in this respect. Officer Galarza did not mention recognizing Arthur Molina as a passenger during his direct testimony.
In any event, Officer Galarza's knowledge that Arthur Molina had used PCP in the past would not serve to escalate the encounter or furnish Officer Galarza with a reasonable suspicion that Mr. Torres was armed or otherwise dangerous, nor do the People contend otherwise (compare People v Isaac, 107 AD3d 1055, 1057-1058 [3d Dept 2013], with People v Holmes, 181 AD2d 27, 29 [1st Dept 1992], affd 81 NY2d 1056 [1993]).
Footnote 6: To the extent Officer Galarza's suspicions were raised by his inability to see into the back of the vehicle due to the tinted rear windows, this safety concern was sufficiently addressed by having all occupants removed from the vehicle (see People v White, 159 AD3d 741, 745 [2d Dept 2018], lv denied 31 NY3d 1089 [2018] ["Notably, there is nothing in the minutes of the suppression hearing to suggest that the police officers were unable to guard against the unique danger of a partially concealed automobile occupant. [The] Sergeant [] fully and satisfactorily addressed any such concerns by asking the defendant to step out of the vehicle in order to readily observe the defendant's movements"]). Additionally, the officers knew that the rear windows of the vehicle had the ability to be lowered as both officers testified that all four windows were down when the minivan first drove toward the police presence at the corner of Rutgers and Madison Streets. As a result, Officer Galarza's inability to see into the back of the car could have been mitigated by asking Mr. Torres to roll down the rear driver side window.
Footnote 7: The People's cases on this point are inapposite. In People v Salaman (71 NY2d 869, 870 [1988]), the Court of Appeals found the frisk lawful where, at night, the officer frisked the defendant after receiving an anonymous report of a man with a gun and the officer's "independent observations corroborated the information received, both as to the specific description of the suspect and as to the exact location where he could be found." Next, in People v White (117 AD3d 425, 425 [1st Dept 2014], lv denied 23 NY3d 1044 [2014]), this Court upheld as lawful a pursuit conducted "[l]ate at night" after the defendant fled upon seeing plainclothes officers and was observed "'clutching' at his waistband in a manner that indicated the presence of a weapon." Lastly, in People v Siler (288 AD2d 625, 625-626 [3d Dept 2001], lv denied 97 NY2d 709 [2002]), the Third Department held that, after observing a vehicle "take apparent evasive action," "the police officer, confronting two persons [both occupants] on a street late at night who are backing away from him, had adequate reason to be concerned for his safety and, thus, the pat-down search was justified."
Footnote 8: The cases cited by the concurrence are distinguishable. Carmona and Darby concerned whether the officers had probable cause to arrest or to search the defendant specifically for possession of an illegal substance; neither presented the question, relevant here, of whether the officers had reasonable suspicion that the defendant was armed or otherwise dangerous (see People v Carmona, 149 AD3d 670, 671 [1st Dept 2017], lv denied 29 NY3d 1090 [2017]; People v Darby, 263 AD2d 112, 114 [1st Dept 2000], lv denied 95 NY2d 795 [2000]). The remaining cases relied on by the concurrence are irrelevant to the specific question presented by this appeal as framed by the parties' arguments and the testimony elicited below, inasmuch as the People do not argue that the odor of the PCP furnished the officers with probable cause to search the vehicle and its occupants. Rather, the People argue on appeal that the circumstances of the stop gave rise to a reasonable suspicion that Mr. Torres was armed or otherwise potentially dangerous, and the odor of the PCP "only strengthened that inference." To that end, we have no occasion to address whether the PCP's odor furnished the officers with probable cause to search the van and its occupants. Finally, contrary to the concurrence's suggestion, because Supreme Court did not deny the suppression motion on the basis that the pat down was justified by probable cause, affirmance on that basis (had the testimony regarding the PCP's odor been credited) would likely still be precluded under the present posture (see People v Ingram, 18 NY3d 948, 949 [2012], citing People v LaFontaine, 92 NY2d 470 [1998]). 

Footnote 9: Furthermore, even though respondent asserts on appeal that PCP is "a hallucinogenic notorious for prompting unpredictable and violent behavior from its users," Officer Galarza testified that there was no indication that Mr. Torres was under the influence of PCP the night of his arrest and no evidence that any narcotic had been recently used in the van.
Footnote 10: Mr. Torres pulled over immediately after the police officers' engaged their lights. Additionally, there was no testimony that Mr. Torres refused to roll down the car's windows when instructed to do so by Officer McDevit. Officer Galarza explained that "[a]t one point [Mr. Torres] took [his hands] away from the steering wheel," at which time Officer Galarza "told him to keep it on the steering wheel." There was no testimony that Mr. Torres did not comply with the directive. There is also no testimony indicating that Mr. Torres, upon Officer Galarza's directive to step out of the vehicle, did anything other than immediately comply. Moreover, there was no testimony that the other occupants did not comply with the instruction to step out of the vehicle. In fact, even with respect to the only instance of the occupants failing to adhere to the officers' directives—Mr. Torres's inability to produce his license and registration—it is unclear from the testimony how long this noncompliance lasted before Officer Galarza asked Mr. Torres to step out of the vehicle so that he could be frisked.
Footnote 11: Of note, precedent applies similar but not identical standards to level three stops under De Bour and vehicle searches absent probable cause, the latter of which are not governed by De Bour (compare People v Batista, 88 NY2d at 654 ["Yet the propriety of a frisk is not automatic. The officer must have knowledge of some fact or circumstance that supports a reasonable suspicion that the suspect is armed or poses a threat to safety"], with People v Scott, 216 AD3d 552, 553 [1st Dept 2023] ["Absent probable cause, the police are allowed to conduct a limited intrusion into the vehicle only if the totality of the information available supports a reasonable conclusion that there is a substantial likelihood of a weapon within the vehicle that poses an actual and specific threat to the officers' safety"]).
Footnote 12: Similarly, to the extent the cited cases discuss the justification of a "search," whereas in this case the People seek to justify only a frisk, a search is more intrusive than a frisk (see People v Diaz, 81 NY2d 106, 109 [1993]; People v Andrews, 243 AD2d 321, 324 [1st Dept 1997], lv denied 91 NY2d 923 [1998]; People v Rainey, 228 AD2d 285, 287 [1st Dept 1996]; People v Smith, 125 AD2d 259, 262 [1st Dept 1986], appeal dismissed sub nom. People v Robinson, 69 NY2d 1014 [1987]; Matter of Terrence G., 109 AD2d 440, 446 [1st Dept 1985]). Accordingly, if the facts found by the court would have justified a search, it follows that a less intrusive frisk also would have been justified.

Footnote 13: Galarza's detection of the odor of PCP emanating from defendant necessarily gave rise to reasonable suspicion that defendant was in criminal possession of that illegal drug.